UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

       *Plaintiff,*

vs.                                     Case No. 24CR50

STEVEN ANDEREGG,

       *Defendant.*

---

**OMNIBUS BRIEF**

---

Joseph A. Bugni
Olivia P. Heiser (law clerk)
Delaney B. Agnew (law clerk)
*Wisconsin Bar No.* 1062514
HURLEY BURISH, S.C.
33 E. Main Street, Suite 400
Madison, WI 53703
(608) 257-0945
jbugni@hurleyburish.com

# TABLE OF CONTENTS

I.    Introduction and overview of the case law supporting the pretrial motions.........1

II.   Obscenity has a higher bar than mere pornography, focusing on whether the image is patently offensive and utterly without serious artistic value...................7

    A.   A brief history of obscenity jurisprudence and why the earlier cases inform the latter.................................................................................................7

    B.   Miller decides that only patently offensive, prurient material without serious value falls outside the First Amendment...........................................9

    C.   Fifty years of post-Miller decisions establish that not all pornography is obscene. ...............................................................................................11

        i.   A work is patently offensive when it goes substantially beyond what is a normal portrayal of sex. .....................................................12

        ii.  The work must also be without serious artistic value when taken as a whole..................................................................................14

        iii. Understanding the evolution of the First Amendment's protection of sexual images. .........................................................................16

    D.   Under Stanley, the First Amendment protects a person's right to have and produce obscene material inside the home...................................................18

    E.   Before a search warrant can issue for allegedly obscene material, the First Amendment demands a searching inquiry...................................................21

III.  The precedent laid out above establishes why the defense's motions must be granted. ............................................................................................................24

    A.   Motion to Suppress the Search Warrant: it could not issue based on the affidavit's description.....................................................................................27

        i.   The search warrant did not provide enough information for a searching inquiry into whether the images were obscene............27

        ii.  The search warrant did not provide enough information for an issuing court to appreciate the serious value of the images. ........30

        iii. Beyond the First Amendment problems, the affidavit failed to tie Anderegg's home to the IP address when these images were shared.................................................................................35

    B.   Motion to Dismiss Counts Two and Three: the images that Anderegg allegedly distributed are not obscene. ...........................................................37

HURLEY BURISH, S.C.

C.      Motion to Dismiss Counts One and Four: under Stanley, he had a right to possess and produce them within the confines of his home. ...................... 39

D.      Motion for in Camera Review of the grand jury instructions to ensure that the grand jury was properly charged. ............................................................ 43

E.      Motion for a Bill of Particulars to know precisely what images the government will argue are obscene. ............................................................. 48

IV.    Conclusion........................................................................................................... 49

HURLEY BURISH, S.C.

## I.     Introduction and overview of the case law supporting the pretrial motions.

This case is not about child pornography: the rules and analysis for those cases don't apply here. This is all about obscenity and the First Amendment, and it's a much, much different framework.[1] Child pornography case law rests on the abuse of a child—so an image of a seventeen-year-old showering qualifies as child pornography even if it's not obscene.[2] The Supreme Court has set a different bar for obscenity because "sexual expression which is indecent but not obscene is protected by the First Amendment."[3] That is, not all images that are colloquially described as pornographic are obscene.[4] Rather, pornographic material is only obscene when it is (in the Supreme Court's words) "patently offensive," "hard core" pornography.[5]

To help distinguish between pornography and obscene materials, in *Miller v. California,* the Supreme Court provided this test: "works which, taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value."[6] Read in the abstract, the words "prurient" and "patently offensive" seem hard to define. Thankfully, throughout the opinion, the Court circled back to the fact that "obscene" materials are those that contain "hard core" pornography:

---

[1] *Reno v. ACLU*, 521 U.S. 844, 875 (1997); *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 245 (2002).
[2] *United States v. Donoho*, 76 F.4th 588, 597–98 (7th Cir. 2023); *see Excellent Publications, Inc. v. United States,* 309 F.2d 362, 364 (1st Cir. 1962).
[3] *Reno*, 521 U.S. at 874 (quoting *Sable Communications v. FCC*, 492 U.S. 115, 126 (1989)).
[4] *Miller v. California*, 413 U.S. 15, 19 n.2 (1973).
[5] *Id.* at 27.
[6] *Id.* at 25.

- "[N]o one will be subject to prosecution for the sale or exposure of obscene materials unless these materials depict or describe *patently offensive 'hard core' sexual conduct.*"[7]

- "[A] majority of this Court has agreed *on concrete guidelines to isolate 'hard core' pornography* from expression protected by the First Amendment."[8]

And with the deft use of adverbs, the opinion gave meaning to the term "hard core."[9] It is material that "goes *substantially* beyond customary limits of candor and affronts contemporary community standards of decency."[10]

Again, not all pornographic material is obscene—obscene materials rise to a much different level. So while an image of a minor masturbating is clearly pornography and (for that matter) child pornography, if it's not a real child, it's not (without more) obscene.[11] Likewise, while an image of a minor showering would qualify as child pornography, it wouldn't be deemed obscene.[12] Case law makes that point plain, and it's an important point because the question is not whether the images involve nude minors or minors engaged in sexual acts—they *always* will. It's whether the images are patently offensive, hard core pornography that does not have serious value because *only* that material qualifies as obscene and by extension *only* obscene material can be criminalized because *only* obscene materials aren't protected by the First Amendment.[13]

---

[7] *Id.* at 27 (emphasis added).

[8] *Id.* at 29 (emphasis added).

[9] *Id.* at 36–39.

[10] *Id.* at 31 (emphasis added).

[11] *See United States v. Arthur,* 51 F.4th 560, 570–71 (5th Cir. 2022); *see also New York v. Ferber*, 458 U.S. 747, 764 (1982).

[12] *See United States v. Various Articles of Obscene Merch.*, Schedule 1724, 460 F. Supp. 826, 830 (S.D.N.Y. 1978); *see also United States v. Various Articles of Merch.*, 230 F.3d 649, 657 (3d Cir. 2000).

[13] *Free Speech Coalition,* 535 U.S. at 245.

That's a critical point because so much of this case rests on the First Amendment, both its protection of material that isn't obscene and its protection of a person's right to possess obscene material, so long as it's inside the privacy and sanctity of the home. In *Stanley v. Georgia*, the Supreme Court made that plain: "Whatever may be the justifications for other statutes regulating obscenity, *we do not think they reach into the privacy of one's own home.* If the First Amendment means anything, it means that a State has no business telling a man, *sitting alone in his own house,* what books he may read or what films he may watch. Our whole constitutional heritage rebels at the thought of giving government the power to control men's minds."[14] And the Court was clear on the geographic limits that the First Amendment covers: The "power to regulate obscenity … *simply does not extend to mere possession by the individual in the privacy of his own home.*"[15] That principle resonates here, because two of the counts turn on actions that (taking the allegations as true) Anderegg did in the confines of his own home.

Consistent with *Stanley,* inside his own home, Anderegg has the freedom and absolute right to possess and produce obscene materials. He can't take them outside the home, he can't distribute them, nor (for that matter) can he receive them.[16] But so long as it's inside the home, the First Amendment shields his activities.[17] Thus, even if these images are obscene (the ones in the search warrant definitely aren't) and even though

---

[14] 394 U.S. 557, 565 (1969) (emphasis added).

[15] *Id.* at 568 (emphasis added).

[16] *United States v. Orito*, 413 U.S. 139, 143 (1973); *United States v. Twelve 200-ft. Reels of Super 8mm. Film*, 413 U.S. 123, 128 (1973); *Osborne v. Ohio*, 495 U.S. 103, 108 (1990).

[17] *See Stanley,* 394 U.S. at 565.

3

Anderegg can't distribute the images, he has the absolute right to possess and produce obscene materials *inside* his own home.

When it comes to obscene materials, "[t]he line between speech unconditionally guaranteed and speech which may legitimately be regulated, suppressed, or punished is finely drawn. The separation of legitimate from illegitimate speech calls for sensitive tools."[18] And yet there are firm and absolute distinctions that have been hashed out between what is (and is not) obscene. Here, the search-warrant application lost sight of those subtle and important distinctions. When it comes to search-warrant applications for obscene materials, courts have been clear: the issuing judge cannot simply ratify the officer's opinion.[19] The judge needs to see the image or (at the very least) have a sufficient factual basis to engage in a "searching inquiry" evaluating the obscenity issue.[20] And "[a] judge cannot ordinarily make this determination without either a look at the allegedly pornographic images, or at least an assessment based on a detailed, factual description of them."[21]

Yet here, all that was provided to the judge in the first search-warrant application was two descriptions, which mirrored what Instagram had sent law enforcement, and did not tackle *any* aspect of what the court would have to consider in deciding whether the material was obscene. Here is what the judge was given about the images:

---

[18] *Marcus v. Search Warrant of Property*, 367 U.S. 717, 731 (internal quotation omitted) (alterations omitted).

[19] *United States v. Brunette*, 256 F.3d 14, 17–18 (1st Cir. 2001) (citing *Illinois v. Gates,* 462 U.S. 213, 239 (1983)).

[20] *Lee Art Theatre, Inc. v. Virginia*, 392 U.S. 636, 637 (1968); *Furfaro v. City of Seattle*, 984 P.2d 1055, 1059 (Wash. Ct. App. 1999) (quoting *Marcus*, 367 U.S. at 732).

[21] *Brunette*, 256 F.3d at 18.

HURLEY BURISH, S.C.

This image depicted what appeared to be a prepubescent juvenile male kneeling on a blue blanket in a wooded area. The male was partially clothed, only wearing a baseball cap and white underwear. The male had his erect penis exposed through the opening in his underwear. In the background of the image were other clothed, pre or young pubescent children. The male was posed in a manner that made his erect penis the focal point of the image. This image appears to be computer-generated content.[22]

This image depicted what appeared to be a different prepubescent juvenile male kneeling on a blue blanket in a wooded area leaning back on his hands with his legs spread far apart exposing his erect penis. The male had a blue cloth draped across his stomach, but other than that, was completely nude. There was a partially clothed juvenile female with brown hair kneeling to the left of the male looking over his shoulder at him. The male in this image was posed in a manner that made his penis the focal point of the image. This image appears to be computer-generated content.[23]

To paraphrase the Seventh Circuit in *United States v. Griesbach,* while a picture is worth a thousand words, those descriptions aren't "worth even one picture."[24] Those descriptions don't allow for a "searching inquiry." With those descriptions, there could not (and would not) be any grappling with whether *these* images are obscene. Would they qualify as child pornography if it was an image of a real child? Maybe. But (again) that's not the analysis for materials that don't involve actual children—the question for a virtual image is whether it's obscene.

All we have is a few sentences and nothing that speaks to the ultimate issue: is it hard core, patently offensive pornography and is it without serious value? To the first point, nothing in that description speaks to whether the images are patently offensive, hard core pornography. Is an image of a boy with his penis exposed, surrounded by

---

[22] Ex. A. at 11.
[23] *Id.*
[24] 540 F.3d 654, 656 (7th Cir. 2008).

5

others, odd? Troubling? Disturbing? Sure. But patently offensive, hard core pornography? No. What's more, there is nothing in the search-warrant application that would allow the judge to scrutinize whether the image lacks serious literary, artistic, political, or scientific value. Without setting out that aspect of the analysis and without the judge seeing the images, the judge could not make the critical call: is there probable cause to find that these images are obscene? And if he couldn't make that call then the warrant couldn't issue. Consistent with the case law set out below, the search warrant issued here cannot be upheld.

That is an overview of all that follows, explaining why Counts One and Four must be dismissed under *Stanley,* why (as a matter of law) Counts Two and Three must be dismissed because the images are not obscene, why the evidence seized pursuant to the search warrant must be suppressed, and why this Court must view *in camera* the grand jury instructions and grant a Bill of Particulars.

## II. Obscenity has a higher bar than mere pornography, focusing on whether the image is patently offensive and utterly without serious artistic value.

The Introduction provided a high-level analysis of this case and the motions filed, but to understand why relief must be granted, it's critical to *really* understand the law surrounding obscenity. That includes a *brief* history of the last seventy-five years of obscenity jurisprudence. Few want to return to a law school seminar on *Sex and the Law*, but the early cases inform the language that courts use and how the obscenity test operates. That includes *Miller* and the critical distinction that *not* all pornography (even that involving children) is obscene. Instead, case law and evolving social mores have provided lines between what's distasteful, even odious, and what's obscene. And those cases and those principles control here.

### A. A brief history of obscenity jurisprudence and why the earlier cases inform the latter.

For most of our Nation's history, the question of "obscenity" was left to the States, and it wasn't until the 1950s that the Supreme Court in *Roth* tackled the First Amendment implications.[25] There, the Court examined the protection the Constitution gave certain types of speech and found that, like libel and slander, obscenity was "utterly without redeeming social importance" and universally prohibited.[26] Based on its failure to contribute to the common good, the Court categorically stated that "obscenity is not within the area of constitutionally protected speech."[27]

---

[25] *Roth v. United States*, 354 U.S. 476, 488 (1957).
[26] *Id.* at 484.
[27] *Id.* at 485.

HURLEY BURISH, S.C.

The question then remained: how to define "obscenity" in a manner that would protect non-obscene material from censorship? The Court defined obscenity as material that was "utterly without redeeming social importance" and that deals with sex in a manner "appealing to the prurient interest."[28] As one would imagine, that was not a helpful test, and challenges abounded to books, plays, magazines, and movies.[29] Then in 1966, the Court reworked the definition of obscenity in *Memoirs of a Woman of Pleasure*. There, it fashioned a new, three-part test:

1. That the material's dominant theme, taken as a whole, appeals to the prurient interest;

2. That the material is patently offensive pursuant to community standards; and

3. That the material is utterly without redeeming social value.[30]

The Court added the "patently offensive" requirement, and addressed whether to look at the work as a whole or just the offending part.[31] It decided that you must look at the work as a whole.[32]

In the wake of the sexual revolution, the Court continued to be slammed with cases about whether this or that film was protected by the First Amendment.[33] And it was stuck making many *ad hoc* decisions. This included, in one case, the whole Court watching the

---

[28] *Id.* at 484.

[29] *See, e.g., United States v. A Motion Picture Film Entitled "I Am Curious-Yellow"*, 404 F.2d 196, 201 (2d Cir. 1968); *A Quantity of Copies of Books v. Kansas*, 378 U.S. 205, 210–11 (1964); *Bantam Books, Inc., v. Sullivan*, 372 U.S. 58, 66 (1963).

[30] *A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney Gen. of Mass.*, 383 U.S. 413, 418 (1966).

[31] *Id.*

[32] *Id.*

[33] *See, e.g., New York v. P.J. Video, Inc.*, 475 U.S. 868, 873–74 (1986); *Smith v. United States*, 431 U.S. 291, 306 (1977).

film "The Lovers," which contained an explicit sex scene.[34] Agreeing the film was not

obscene, Justice Stewart noted that obscenity was only: "*hard-core pornography*."[35]  And he

added a phrase that still abounds in the law and culture: "I shall not today attempt further

to define the kinds of material I understand to be embraced within that shorthand

description . . . *But I know it when I see it,* and the motion picture involved in this case is

not that."[36]

Over the next few years, the Court tried to construct a better test for what was

obscene. Clearly the material had to be patently offensive, and everyone agreed it only

reached "hard core" pornography, but the rest of the test was unworkable: what is a work

that is "utterly" without redeeming value? What was "hard core" pornography? No one

really knew until five Justices said so.

**B.** *Miller* **decides that only patently offensive, prurient material without serious value falls outside the First Amendment.**

That brief history of obscenity law led up to *Miller.* There, the Court was

confronted with the Justices' competing views on what was (and wasn't) protected by the

First Amendment.[37] After reviewing *Roth* and *Memoirs of a Woman of Pleasure*, the

principles those cases set out and the difficulty in applying their tests, the Court noted a

new test was needed.[38] Clearly, obscenity was not protected by the First Amendment, but

the question was: how do you define obscenity? In a single sentence, it came up with this

---

[34] *Jacobellis v. Ohio*, 378 U.S. 184, 195–96 (1964).
[35] *Id.* at 197 (Stewart, J., concurring) (emphasis added).
[36] *Id.* (emphasis added).
[37] *See Miller*, 413 U.S. 15 at 20.
[38] *See id.* at 20–22.

Hurley Burish, s.c.

formulation: the work must "appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value."[39]

While the opinion has interesting observations about the "contemporary community standards," the real takeaway focuses on the second and third elements. Concerning the second element (the offensive inquiry), the Court was clear: not every depiction of sex or masturbation, or exhibition of the genitalia, is obscene; the depiction must be "patently offensive." With effective adverbs, the Court noted precisely what was covered:

> (a) *Patently offensive* representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated.
>
> (b) *Patently offensive* representations or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals.[40]

The Court returned to the "patently offensive" analysis from *Memoirs* and emphasized that obscenity only reached hard-core pornography: "Under the holdings announced today, no one will be subject to prosecution for the sale or exposure of obscene materials unless these materials depict or describe *patently offensive 'hard core' sexual conduct specifically defined by the regulating state law*."[41]  That is, material that "goes *substantially* beyond customary limits of candor and affronts contemporary community standards of decency."[42]

---

[39] *Id.* at 24.
[40] *Id* at 25 (emphasis added).
[41] *Id.* at 27 (emphasis added).
[42] *Id.* at 31 (emphasis added).

The Court then addressed the I-know-it-when-I-see-it standard and how unworkable it was: no one in the country knew what was really obscene.[43] The *Miller* test would solve all the prior problems because now there were "concrete guidelines to isolate 'hard core' pornography from expression protected by the First Amendment."[44] The opinion continued: "The protection given speech and press was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.  But the public portrayal *of hard-core sexual conduct for its own sake*, . . . is a different matter."[45] With that, there was a new threshold and understanding that cases for fifty years would be guided by—determining whether the images themselves depict hard core sexual conduct, whether they are patently offensive, and whether, taken as a whole, the images are without any serious value.

### C. Fifty years of post-*Miller* decisions establish that not all pornography is obscene.

The cases that followed in *Miller*'s wake ranged from seizures of pornographic books to arrests of movie projector operators and museum curators.[46] Through it all, certain guidelines emerged, including *how* courts understand what's patently offensive, hard-core pornography—even if they feature hard core sexual elements.

---

[43] *See id.* at 23–25.

[44] *Id.* at 29.

[45] *Id.* at 34–35 (internal quotations omitted) (emphasis added).

[46] *See, e.g.*, *Butler v. Dexter*, 425 U.S. 262, 263 (1973); *Jenkins v. Georgia*, 418 U.S. 153, 161 (1974); *Cincinnati v. Contemporary Arts Center*, 57 Ohio Misc. 2d 9, 11, 566 N.E.2d 207 (Hamilton Cnty. Ct. 1990); *Young v. Am. Mini Theatres*, 427 U.S. 50, 70 (1976); *A Quantity of Copies of Books v. Kansas*, 378 U.S. 205, 210–11 (1964).

HURLEY BURISH, S.C.

### i.    A work is patently offensive when it goes substantially beyond what is a normal portrayal of sex.

The cases that grapple with what's "patently offensive" are careful to note that we're dealing subtle distinctions that can get blurred. And, as the Supreme Court observed in *Miller*, standards change: "One can concede that the 'sexual revolution' of recent years may have had useful byproducts in striking layers of prudery from a subject long irrationally kept from needed ventilation."[47]

Despite those changing mores, certain rules persist. When an actual child is involved the *Ferber* analysis applies.[48] Any pornography involving a child can be criminalized because it's not only the image that's condemned but also the revictimization of a child.[49] It's important to remember that in *Ferber* the movie at issue showed two minor boys masturbating; it wasn't obscene, but because it was real children it could be criminalized.[50] But when there's not actual minors (as in computer-generated pornography) then *Miller* controls and it demands more—patently offensive, hard-core pornography, which can be described as materials that go "*substantially* beyond" normal depictions of sexual conduct.[51]  That point was made plain in *Free Speech Coalition,* where the Court affirmed that "[v]irtual child pornography is not 'intrinsically related' to the sexual abuse of children."[52] And it noted that some works in the category of virtual child

---

[47] *Miller*, 413 U.S. at 36.
[48] *New York v. Ferber*, 458 U.S. 747, 764 (1982).
[49] *Id.*
[50] *Id.*
[51] *See* 413 U.S. at 27 (emphasis added); *see also United States v. Williams*, 553 U.S. 285, 288–89 (2008).
[52] 535 U.S. at 250 (quoting *Ferber*, 458 U.S. at 759).

pornography "might have significant value."[53] Thus, with virtual images of children the issue is whether they run afoul of *Miller*, not whether they are merely pornographic.[54]

For the most part, the cases charged reflected that reality, but sometimes the government has gone too far. In *Arthur*, the Fifth Circuit was confronted with images of rape and mutilation of children, and those qualified as obscenity.[55] They were hard-core pornography and, without question, patently offensive.[56] But an image of a minor masturbating was not. In the Court's words:

> Count 1 is a simple black and white pencil or charcoal drawing with minimal detail depicting an adolescent girl alone, reclining and apparently masturbating. Importantly, unlike the children depicted in the images in Counts 8 and 9, there is no indication that the subject of the image in Count 1 is being forced to perform a sexual act. The drawing is simple and utterly lacking in violent depictions. Our independent constitutional review of the image charged in Count 1 leads us to the conclusion that it is not obscene under *Miller*.[57]

That makes sense because even though a minor masturbating (whether it's a photograph, a wax sculpture, or a charcoal drawing) can be disturbing and not coffee-table material, it's not patently offensive, nor can it be described as hard-core pornography.[58]

To be clear, the focus isn't on the medium—charcoal versus watercolor, fresco versus AI—but rather on what's depicted: hard core, patently offensive sexual conduct. The drawing in *Arthur* captured, for lack of a better term, somewhat pedestrian sexual

---

[53] *Id.* at 251.

[54] *Id.*

[55] *Arthur*, 51 F.4th at 570.

[56] *Id.*

[57] *Id.* at 570–71.

[58] *Id.*

conduct—no matter the medium, it's just a teenager masturbating. As the Supreme Court has observed: "the visual depiction of an idea—that of teenagers engaging in sexual activity—that is a fact of modern society and has been a theme in art and literature throughout the ages."[59] So the fact that an image captures a minor exposing themselves, or masturbating or even having sex is not, by itself, obscene.[60] It's sexual and it's no doubt pornographic, but it's just not obscene.

### ii.     The work must also be without serious artistic value when taken as a whole.

That leads to the second important point from *Miller*'s progeny: the image has to be taken as whole.[61] In *Miller,* the Court wrestled with whether the content was "utterly without redeeming social value."[62] That was an unworkable standard since anything would have *some* social value.[63] And so, the Court settled on the formulation that taken as a whole, the work does not have serious literary, artistic, political or scientific value.[64] The question became: how do you analyze the work and whether it has serious value?

To the first question, the work is taken as whole, so that sex scene from *Romeo and Juliet* can't be spliced out from the rest of the play and adjudged obscene—no matter how raunchy and gratuitous that scene may be.[65] The issue is whether the piece has serious

---

[59] *Free Speech Coalition*, 535 U.S. at 246.
[60] *See id.; see also United States v. Various Articles of Merch.*, 230 F.3d at 657.
[61] *Id.* at 248.
[62] *See* 413 U.S. at 20–30.
[63] *See id.* at 21–23.
[64] *Id.* at 24.
[65] *See Free Speech Coalition*, 535 U.S. at 247.

Hurley Burish, s.c.

value on the whole.[66] One way to look at that is when the offensive image or component is removed, what remains? That is, does taking out the hard core, patently offensive image (or aspect or scene) mean there is something that would have otherwise been lost because of the prurient parts.[67] But that too is incomplete and inaccurate because even movies and images devoted to and dominated by sex can have serious value and that value changes as society's mores and appreciations for a work evolves.[68] And in no sense can a work be condemned because it has sexual content, even sexual content that is outside the mainstream; it can only be condemned when "*taken as a whole*" it appeals "to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, *taken as a whole*, do not have serious literary, artistic, political, or scientific value."[69]

---

[66] *United States v. Various Articles of Merch., Seizure Nos. 550 & 552*, No. 90 C 4773, 2, 1991 WL 32726 (N.D. Ill. Mar. 7, 1991), aff'd sub nom. *United States v. Various Articles of Merch., Seizure No. 550 & No. 552*, 972 F.2d 352 (7th Cir. 1992) (unpublished); *Miller*, 413 U.S. at 24.

[67] *See Lordi v. UA N.J. Theatres, Inc.*, 108 N.J. Super. 19, 23–25, 259 A.2d 734 (1969) (citing *United States v. A Motion Picture Film Entitled "I Am Curious-Yellow"*, 404 F.2d 196, 201 (2d Cir. 1968) (Friendly, J., concurring).

[68] *See id.*

[69] *Miller*, 413 U.S. at 24 (emphasis added).

### iii.   Understanding the evolution of the First Amendment's protection of sexual images.

To understand an image's value, the Court also has to consider the way images of sexual conduct have been (and are) protected by the First Amendment. Since men started drawing on the walls of caves, they featured images of sex.[70] It continued with Grecian pottery and sculpture showing sex with young boys.[71] It's seen in African and Asian art, depicting fertility dolls, sex with multiple partners, and many subjects who are *very* young.[72] In Europe, it's been a theme in art since the Enlightenment—freed of state censorship, works with sexual themes and even sex with minors abounded.[73] And in America, as each new form of technology has emerged, it's been used to feature sex. From drawings to magazines, from the camera to the movie projector, from BetaMax to the internet, as the technology arrives it's used to portray sexual images—that is just a truism of life.

As sexual depictions have appeared in each new medium, it has been met with calls for censorship and criminal sanctions. People called for Edison's arrest with the showing of a "kiss" in a silent film.[74] In 1938, the publisher of LIFE magazine was

---

[70] *See* Third International Conference on the Rock Art of Northern Africa, *Programme*, Royal Academy for Overseas Sciences (Sept. 12–13 2023) https://tinyurl.com/bdd2nwxb; *see also Free Speech Coalition*, 535 U.S. at 246.

[71] *Two-handled cup with male couples*, held by Museum of Fine Arts Boston's Greek Pottery Collection, https://tinyurl.com/mcn76dzx; Jenna Ross, *Pedophilia in Ancient Greece and Rome*, The Collector (May 23, 2020), https://tinyurl.com/4mhek5ws.

[72] *See* Kinsey Institute, *Eros in Asia: Erotic Art from Iran to Japan Online Gallery*, https://tinyurl.com/mjh92smm; Reina Gattuso (Sept. 2022), *Female Fertility Figurines in the Ancient Mediterranean*, https://tinyurl.com/3vc3cc8b.

[73] *Art Nouveau and the Erotic*, Victoria and Albert Museum https://tinyurl.com/3src62wv.

[74] *See* Olivia B. Waxman, *This is What Americans Used to Consider Obscene*, TIME (June 21, 2016), https://tinyurl.com/3dj89mcp.

acquitted of obscenity charges for selling magazines with stills from the film "Birth of a Baby."[75] And with the release of *Midnight Cowboy* in 1969 there were calls for censorship.[76] That reality isn't only in film. In 1990, the vaunted Cincinnati Art Museum's director was placed on trial for showing a Mapplethorpe exhibit.[77] And as Pornhub and other websites gained traction in America, so did calls for charges to issue.[78]

Yet all of that was protected by the First Amendment and tolerated.[79] From tolerated, those pieces were soon accepted by society at large. And after acceptance, those pieces came to be admired and even celebrated.[80] For his part, Mapplethorpe's photography has a permanent exhibit at the Getty Museum in LA and is featured in books widely available on Amazon. Much of that evolution and understanding has been taken for granted in this brief. But it's important to recall how case law reflects culture and how culture is influenced by case law. A movie that was once reviewed by five Justices for obscenity would now be rated PG-13.

---

[75] *People v. Larsen*, 5 N.Y.S.2d 55, 57 (Ct. Spec. Sess. 1938); *Likes 'Birth of a Baby,'* N.Y. TIMES (April 19, 1938), https://tinyurl.com/rhnbrmn6.

[76] Glenn Frankel, *X-Rated: Inside the Myths and Legends of* Midnight Cowboy, VANITY FAIR (Feb. 26, 2021), https://tinyurl.com/5n6vxxdm.

[77] *Cincinnati v. Contemporary Arts Center*, 57 Ohio Misc. 2d 9, 11, 566 N.E.2d 207 (Hamilton Cnty. Ct. 1990); Alex Palmer, *When Art Fought the Law and Art Won*, SMITHSONIAN MAGAZINE (Oct. 2, 2015), https://tinyurl.com/48p8v7c4.

[78] *C.f. Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 270 (5th Cir. 2024).

[79] *See* Waxman, *This is What Americans Used to Consider Obscene*, TIME (June 21, 2016), https://tinyurl.com/3dj89mcp.

[80] *E.g.*, Robert McDonald, *Censored*, QUEER CULTURAL CTR., https://queerculturalcenter.org/robert-mapplethorpe/; Frankel, *X-Rated: Inside the Myths and Legends of* Midnight Cowboy, VANITY FAIR (Feb. 26, 2021), https://tinyurl.com/5n6vxxdm.

All that accords with the First Amendment's tolerance (and protection) of cutting-edge materials, even those that involve patently offensive, hard-core pornography; if the whole of the work has some serious value, then it is protected.[81] That's an essential component of the First Amendment—the freedom to express ideas, even if they are repugnant to some or even many.[82] After all, as one court observed on this issue: we have "free will to make an independent choice of values and to teach our children to do the same. Paternalistic censorship by government must continue to limit that choice only in the most extreme of circumstances."[83] Outside those most extreme circumstances, the First Amendment provides complete protection.[84]

### D. Under *Stanley*, the First Amendment protects a person's right to have and produce obscene material *inside* the home.

While *Miller* set out the test for what fell outside the First Amendment, the Supreme Court in *Stanley* set out how far the First Amendment's protections stretched for obscene materials.[85] There, the Court acknowledged that obscene materials fell outside the First Amendment and wrestled with it provided (within the privacy of a person's home) the freedom of "mere private possession of such material."[86]

The Court grounded its analysis on the First Amendment's lofty goals and noted that consistent with those values Stanley was "asserting the right to read or observe what he pleases—the right to satisfy his intellectual and emotional needs in the privacy of his

---

[81] *Excellent Publications, Inc.*, 309 F.2d at 364–65.
[82] *Street v. New York*, 394 U.S. 576, 592 (1969); *Matal v. Tam*, 582 U.S. 218, 244 (2017).
[83] *Luros v. United States*, 389 F.2d 200, 206 (8th Cir. 1968).
[84] *Free Speech Coalition*, 535 U.S. at 255.
[85] *Stanley v. Georgia*, 394 U.S. 557, 564 (1969).
[86] *Id.*

own home. *He is asserting the right to be free from state inquiry into the contents of his library*."[87] Even though obscene materials don't have First Amendment protection outside the home, the Court continued that the same material is protected *inside* the home: "[W]e think that mere categorization of these films as 'obscene' is insufficient justification for such a drastic invasion of personal liberties guaranteed by the First and Fourteenth Amendments. Whatever may be the justifications for other statutes regulating obscenity, we do not think they reach into the privacy of one's own home."[88] And it added: "If the First Amendment means anything, it means that a State has no business telling a man, sitting alone in his own house, what books he may read or what films he may watch. *Our whole constitutional heritage rebels at the thought of giving government the power to control men's minds*."[89]

After establishing that the law could only go so far, the Court addressed the counterargument for *why* Georgia (or any state) would want to criminalize obscene materials within a person's home and his private thoughts: "And yet, in the face of these traditional notions of individual liberty, Georgia asserts the right to protect the individual's mind from the effects of obscenity. *We are not certain that this argument amounts to anything more than the assertion that the State has the right to control the moral content of a person's thoughts*."[90]  It then took on the argument more fully, rejecting its logic: this is "wholly inconsistent with the philosophy of the First Amendment. … 'this

---

[87] *Id.* at 565 (emphasis added).
[88] *Id.*
[89] *Id.* (emphasis added).
[90] *Id.*  (emphasis added).

argument misconceives what it is that the Constitution protects.'"[91] The Court then added a point that resonates here: "The line between the transmission of ideas and mere entertainment is much too elusive for this Court to draw, if indeed such a line can be drawn at all."[92]   And it concluded: "*Whatever the power of the state to control public dissemination of ideas inimical to the public morality, it cannot constitutionally premise legislation on the desirability of controlling a person's private thoughts.*"[93]

Consistent with those principles, what happens within the four walls of a person's home (with obscene materials) is off-limits from government control.[94] But, as soon as a person goes beyond the front door, those protections disappear.[95] Case law is clear on that.[96] A person does not have the right to receive obscene materials, even inside the home.[97] A person definitely doesn't have the right to distribute them outside the home.[98] Nor does a person have the right to display the materials outside the home—you can't put a movie projector on your back fence and display obscene movies.[99] But so long as you're inside the home, the First Amendment provides you absolute protection.[100]

---

[91] *Id.* at 566 (quoting *Kingsley International Pictures Corp. v. Regents*, 360 U.S. 684, 688–89 (1959)).
[92] *Id.*
[93] *Id.* (emphasis added).
[94] *Id.* at 564–66.
[95] *See id.* at 568.
[96] *United States v. Reidel*, 402 U.S. 351, 355 (1971); *Twelve 200-ft. Reels of Super 8mm. Film*, 413 U.S. at 126–27.
[97] *United States v. Whorley,* 550 F.3d 326, 332–33 (4th Cir. 2008).
[98] *Id.*
[99] *See id.*
[100] *Stanley*, 394 U.S. at 564.

Now, scholars debate whether *Stanley* is truly a First Amendment case.[101] It clearly uses the words "First Amendment" and uses them a lot. And it remains good law—it's been limited to the home, but never overturned.[102] Yet another way to think of *Stanley* is as a substantive-due-process case before the Court had developed the for what constitutes a "substantive due process" right. To be clear, *Stanley* was decided in 1969, so it was post-*Lochner* and post-*Griswold* but it was before *Roe*, *Casey*, and *Lawrence* where the Court articulated how certain innate rights operate within the right to privacy and sexual freedom.[103] So while *Stanley* grounds itself in the First Amendment, the right it articulates is one of privacy within the home. Within the home a person is free to do as they will with obscene materials, but those materials can't leave the confines of the home—once they do the constitutional protections are lost.

### E. Before a search warrant can issue for allegedly obscene material, the First Amendment demands a searching inquiry.

Back to *Roth* and *Miller*. From those cases, certain principles took root and guided a half-century of jury trials and appellate court fights. But before a case could even get to trial, law enforcement (and courts) faced a different, even more substantial, problem: what showing must authorities make for a warrant to issue for allegedly obscene materials? Again, we're talking about subtle distinctions, so there's a good chance some of the materials seized will be deemed protected—that is, in its zeal, law enforcement

---

[101] *See, e.g.*, Jennifer M. Kingsley, *Sexual Privacy in the Internet Age: How Substantive Due Process Protects Online Obscenity*, 16 VAND. J. ENT. & TECH. L. 103, 109–10 (2013).

[102] *Reidel*, 402 U.S. at 355; *United States v. Ostrander*, 114 F.4th 1348, 1362 (11th Cir. 2024).

[103] Kingsley, *supra* note 102, at 113–15; *Roe v. Wade*, 410 U.S. 113, 152 (1973); *Planned Parenthood v. Casey*, 505 U.S. 833, 846 (1992); *Lawrence v. Texas*, 539 U.S. 558, (2003).

may consider something obscene that isn't. And when that happens, the seizure would be a prior restraint on speech.[104]

Conscious of that reality, the Supreme Court grappled with when search warrants could issue and what steps a court *must take* to ensure a prior restraint doesn't occur. There are three seminal cases on the topic: *Marcus v. Search Warrant of Property*, *A Quantity of Copies of Books v. Kansas*, and *Ft. Wayne Books v. Indiana*.[105] And from those cases, three important principles emerged.

First, the normal way courts approach search warrants for contraband doesn't apply to cases involving obscene materials. The Supreme Court was absolutely clear on that point: "It is no answer to say that obscene books are contraband, and that consequently the standards governing searches and seizures of allegedly obscene books should not differ from those applied with respect to narcotics, gambling paraphernalia and other contraband."[106] The Court rejected that proposition in *Marcus* and repeated it in each subsequent case.[107]

Second, in a point that's been mentioned throughout this brief, the Court provided that the line between protected material and obscenity is "dim and uncertain."[108] Each case made that observation in slightly different ways, but each echoed this same point: "[T]he line between speech unconditionally guaranteed and speech which may

---

[104] *Ft. Wayne Books v. Indiana*, 489 U.S. 46, 63–64 (1989).
[105] *Id.*; *Marcus v. Search Warrant of Property*, 367 U.S. 717, 731 (1961); *A Quantity of Copies of Books v. Kansas*, 378 U.S. 205, 210–11 (1964).
[106] *Quantity of Copies of Books*, 378 U.S. at 211–12.
[107] *Id.*; *Marcus v. Search Warrant of Property*, 367 U.S. at 730–31; *Ft. Wayne Books*, 489 U.S. at 63–64.
[108] *Quantity of Copies of Books*, 378 U.S. at 210 (quoting *Bantam Books, Inc., v. Sullivan*, 372 U.S. 58, 66 (1963)).

legitimately be regulated, suppressed, or punished is finely drawn. *The separation of legitimate from illegitimate speech calls for sensitive tools.*"[109] Thus, courts had to employ "careful procedural safeguards to assure that only those materials adjudged obscene are withdrawn from public commerce."[110]

Third, and building on that second point, *before* allegedly obscene materials can be seized, there has to be a "searching inquiry" of judicial scrutiny.[111] That means a court can't just ratify the officer's conclusory opinion.[112] Rather, there must be a "searching inquiry" into whether the materials are actually obscene.[113] That searching inquiry is described in different verbal formulations.[114] But however it's stated, the principle remains: before a search warrant issues, the court must undertake a real analysis of whether there's a substantial basis to believe that the materials are actually obscene.[115]

That inquiry is best done when the judge actually views the material.[116] There's no question that with the images in front of him or her the judge can make the assessment.[117] But sometimes independently evaluating the materials is impossible—for instance, there is no projection screen in the courthouse.[118] In those cases, the judge must demand enough information to actually make a decision that there's a reasonable basis to

---

[109] *Marcus*, 367 U.S. at 731 (quoting *Speiser v. Randall*, 357 U.S. 513, 525 (1958)) (alterations omitted) (emphasis added).

[110] *Ft. Wayne Books*, 489 U.S. at 79 (O'Connor, J., dissenting).

[111] *New York v. P.J. Video, Inc.,* 475 U.S. 868, 873–74 (1986).

[112] *Brunette*, 256 F.3d at 18.

[113] *P.J. Video, Inc.,* 475 U.S. at 874; *Heller v. New York*, 413 U.S. 483, 489 (1973).

[114] *See P.J. Video, Inc.,* 475 U.S. at 874; *Marcus*, 367 U.S. at 732; *Lee Art Theatre, Inc.,* 392 U.S. at 637.

[115] *Marcus*, 367 U.S. at 732; *see also United States v. Guarino*, 610 F. Supp. 371, 375 (D.R.I. 1984).

[116] *Brunette*, 256 F.3d at 18.

[117] *Id.*

[118] *See Lee Art Theatre, Inc.*, 392 U.S. at 637.

HURLEY BURISH, S.C.

conclude this image qualifies as hard-core patently offensive pornography that lacks serious value.[119] Unless the judge sees the images, law enforcement must provide enough detail for the court to make that call.[120] Thus, while courts often issue search warrants in child pornography cases based on a short description (the minor's genitalia is the focus of the image) that's not the case with obscene materials—a *much* different analysis applies.[121]

### III.   The precedent laid out above establishes why the defense's motions must be granted.

This brief has been devoted to the law, but it's important to re-introduce *briefly* the facts that inform these motions. In relevant part, Anderegg came onto law enforcement's radar through a CyberTip from Instagram. The tip flagged two images as AI-generated images of sexual abuse of children. And law enforcement went to Judge Crocker and got a search warrant for Anderegg's Instagram account. There is no indication Judge Crocker looked at the images. After accessing the Instagram account, agents applied for a second warrant and added the description of a third AI-generated image. There is no indication Judge Crocker looked at that image either. Based on the second search warrant, agents searched Anderegg's home and phone.

Several months later, he was indicted on four counts related to the possession, distribution, transfer, and production of AI-generated obscene materials involving minors. The counts break down this way:

---

[119] *See P.J. Video, Inc.*, 475 U.S. at 873–34.
[120] *Marcus*, 367 U.S. at 732; *see also State v. Hollis*, 98 Ohio App. 3d 549, 555, 649 N.E.2d 11 (1994) (quoting *Gates*, 462 U.S. 213 at 239).
[121] *See Ferber*, 458 U.S. at 764; *see also Brunette*, 256 F.3d at 18.

| Count | Statute | Description |
|:-----:|:-------:|-------------|
| **1** | 1466A | Between October 20 and December 28, 2023, Anderegg allegedly produced at least *one* obscene image. |
| **2** | 1466A | On October 7, 2023, Anderegg allegedly distributed an image of obscene materials. |
| **3** | 1470 | On October 7, 2023, Anderegg allegedly transferred obscene materials to a minor. |
| **4** | 1466A | Between October 20, 2023 and February 22, 2024, Anderegg allegedly possessed an obscene image. |

The defense filed five placeholder motions attacking these charges. The first motion attacks the two search warrants.[122]  To be clear, if the first search warrant falls, then the second would as well under the same reasoning and (even if the third image is added) it would fall as fruit of the poisonous tree.[123]  The second pretrial motion attacks Counts One and Four under *Stanley* because Anderegg possessed and produced the images inside his own home.[124] The third pretrial motion attacks Counts Two and Three because the images pertaining to those counts are not (as a matter of law) patently offensive, hard-core pornography. The fourth pretrial motion seeks the grand jury instructions for *in camera* review. And the fifth pretrial motion seeks a Bill of Particulars for the government to identify the images that it showed to the grand jury and that will be at issue at trial. To be clear, the government has already identified the images pertinent to Counts Two and Three, but we need a Bill of Particulars as it relates to Counts One and Four—our experts and our pretrial preparation cannot be subject to surprise.

---

[122] R.39.

[123] *See Wong Sun v. United States*, 371 U.S. 471, 481–83 (1963); *see also United States v. Cordero-Rosario*, 786 F.3d 64, 68, 73 (1st Cir. 2015).

[124] R.40.

HURLEY BURISH, S.C.

The last twenty-four pages have hopefully laid the groundwork to establish the principles that will control those motions. And everything flows from a correct understanding that the *Ferber* analysis doesn't apply.[125] An image of a nude virtual child or a nude virtual child masturbating won't cut it because "sex is not synonymous with obscenity."[126] To be obscene and outside the First Amendment, the image must *not only* be hard core, patently offensive pornography, *but also* lack serious value.[127] Further, even if a person has obscene material, he can still do what he wants with it within his own home; consistent with *Stanley,* the First Amendment builds a wall around the house that the government cannot penetrate.[128] And finally, when a search warrant issues for obscene materials, the normal rules for drugs, guns, or even child pornography are out the door.[129] There's a different playbook—a search warrant cannot issue unless there has been a "searching inquiry" into whether the material is actually obscene.[130] Get those points right and everything else follows for why the defense's motions should be granted.

---

[125] *Free Speech Coalition*, 535 U.S. at 249; *Arthur*, 51 F.4th at 570–71.

[126] *Illinois v. Kimmel*, 220 N.E.2d 203, 204 (Ill. 1966).

[127] *Miller*, 413 U.S. at 24.

[128] *Stanley*, 394 U.S. at 568; *see United States v. Ostrander*, 114 F.4th 1348, 1362 (11th Cir. 2024).

[129] *Marcus*, 367 U.S. at 730–31.

[130] *See id.* at 731.

HURLEY BURISH, S.C.

### A. Motion to Suppress the Search Warrant: it could not issue based on the affidavit's description.

The search-warrant challenge incorporates the first principles set out above. As opposed to child pornography, a search-warrant affidavit for an obscene image demands a higher showing.[131] And the protections and procedures *Marcus* and other cases set out for seizing obscene materials must be followed.[132] Those are the two core problems with this warrant: the images described aren't obscene and the judge couldn't make a searching inquiry based on the descriptions provided. But the search-warrant application also suffers from a more fundamental and glaring problem—when the allegedly illegal activities were taking place, the officers never tied the account to Anderegg's IP address. They subpoenaed the IP address for different days when nothing took place. Put differently, nothing ties Anderegg's IP address to when the allegedly criminal activity was taking place. Without that, the search warrant could not issue.

### i. The search warrant did not provide enough information for a searching inquiry into whether the images were obscene.

The initial search-warrant affidavit sought evidence that Anderegg possessed and distributed obscene materials. Again, when law enforcement seeks a warrant for obscene materials they need to give the court enough information for the court to determine whether the images are obscene.[133] The court cannot just ratify the officer's conclusion that the materials are obscene; rather, there has to be sufficient facts alleged.[134]

---

[131] *See id.* at 731–32.

[132] *Id.*; *A Quantity of Copies of Books*, 378 U.S. at 210–11.

[133] *Marcus*, 367 U.S. at 731; *A Quantity of Copies of Books*, 378 U.S. at 210–11.

[134] *Marcus*, 367 U.S. at 732.

Here, when it comes to the first search warrant there are only two paragraphs that describe the images, and they are the verbatim recitation of the CyberTip. The sexual aspects of the descriptions are italicized.

> This image depicted what appeared to be a prepubescent juvenile male kneeling on a blue blanket in a wooded area. The male was partially clothed, only wearing a baseball cap and white underwear. *The male had his erect penis exposed through the opening in his underwear.* In the background of the image were other clothed, pre or young pubescent children. The male was posed in a manner that made his *erect penis* the focal point of the image. This image appears to be computer-generated content.[135]

> This image depicted what appeared to be a different prepubescent juvenile male kneeling on a blue blanket in a wooded area *leaning back on his hands with his legs spread far apart exposing his erect penis.* The male had a blue cloth draped across his stomach, but other than that, was completely nude. There was a partially clothed juvenile female with brown hair kneeling to the left of the male looking over his shoulder at him. The male in this image was posed in a manner that made his *penis* the focal point of the image. This image appears to be computer-generated content.[136]

The second search warrant for Anderegg's home contained a description of a third allegedly obscene image that the affiant believed Anderegg sent:

> This third image depicted what appeared to be three prepubescent boys standing in a row in a wooded area. The boys are all shirtless and wearing tiny shorts. The boy on the left has his *erect penis sticking out of his shorts.* The boy on the right has his *shorts zipped down to expose his penis, which the boy in the middle appears to be gripping with his hand.* The boys are clearly intended to be prepubescent based on their small statures, underdeveloped physiques, and youthful facial features.[137]

Those descriptions provide little by way of content or context for a court to determine—without seeing the images—whether they fall qualify as obscene.

---

[135] Ex. A. at 11.
[136] *Id.*
[137] Ex. B at 34.

28

From Instagram's initial alert to what was provided to the issuing judge, *nothing* was done to provide *additional* facts that would inform a court's decision on whether the images are actually obscene. And from those vague descriptions, we don't even have a sex act being displayed. We have nudity, which is not obscene and often not even enough to find that the image is child pornography.[138] And the description of the third image is even *less* offensive than what the Fifth Circuit found not obscene in *Arthur*—a minor masturbating.[139] And all of the images are less offensive than what the Eighth Circuit found was not obscene—"nude or nearly-nude males, all with their genitalia fully exposed" but consisting of "no sexual activity"—albeit with adults.[140] Here, there is nothing about the images that would make them into remotely patently offensive, hard-core pornography. Is it pornography? Maybe—probably, sure. But it doesn't matter because the question is: Is the image patently offensive, hard-core pornography? Certainly not. Those descriptions just don't cut it.

---

[138] *See, e.g.*, *United States v. Griesbach*, 540 F.3d 654, 656 (7th Cir. 2008); *United States v. Soderstrand*, 412 F.3d 1146, 1151 (10th Cir. 2005); *United States v. Kemmerling*, 285 F.3d 644, 645–46 (8th Cir. 2002).
[139] *Arthur*, 51 F.4th at 570.
[140] *Spinar v. United States*, 440 F.2d 1241, 1242 (8th Cir. 1971); *United States v. Various Articles of Merch.*, 230 F.3d 649, 657 (3d Cir. 2000).

### ii.    The search warrant did not provide enough information for an issuing court to appreciate the serious value of the images.

What's more, there is nothing in the description that allowed the court to answer whether there was any serious value in the photos. *Miller*'s third prong could be deemed an afterthought; but it's critical that the court tackles the *full* analysis before a search warrant issues.[141] That means: the court had to know, how does the prurient part of the image fit within the whole? To answer that, the best practice is for the court to see the image and make its own independent analysis.[142] But the failure to provide the image and the issuing judge's failure to demand it doesn't excuse the court's need to determine *for itself* whether there was any serious value.[143]

To that point, the descriptions quoted above didn't allow for that aspect of the analysis. It just recited the nudity, but that's not enough to gauge whether an image is without serious value—*i.e.*, obscene. Think about it in these terms. Some renowned pieces of art could be described as child erotica, or even child pornography. If the affiant here were describing some of those works in search-warrant speak, he might say:

> This image depicts a group of people standing and sitting on rocks. The focal point of the image is a fully nude post-pubescent minor female with breasts and genitalia exposed. She is surrounded by five other nude post-pubescent individuals who appear to be touching each other. Two nude pre-pubescent children are touching each other and one child is staring up at the center female. There are nude pre-pubescents in the background, some with genitalia exposed. The pre-pubescent minors are clearly intended to be pre-pubescent based on their small statute, underdeveloped physique, and youthful facial features.

---

[141] *See Marcus*, 367 U.S. at 732.
[142] *See P.J. Video, Inc.*, 475 U.S. at 873–74; *see also United States v. Miknevich*, 638 F.3d 178, 183 (2011).
[143] *See Marcus*, 367 U.S. at 732.

That would be an accurate, though not complete description of these images. The one on the right is an AI-generated version (to appear as a photograph) of the one on the left, which is William-Adolph Bouguereau's *Birth of Venus,* which hangs in the Musée d'Orsay.

 

All of the serious value is lost when the description is so vague and the image isn't shown. To be clear: the point is not the child nudity or the medium (oil-on-canvas versus AI) but rather the descriptions—the affiant's description needed to speak to whether the image had serious value. But the previous page's description (which intentionally parrots the warrant's) doesn't speak to the image's value—it's silent.

31

To that end, consider this description, which could easily be found in a search-warrant affidavit and reflects a much different sort of image:

> This image depicts a pre-pubescent minor female with genitalia exposed. The minor female appears to be lying over the lap of a post-pubescent female adult. The minor female is intended to be pre-pubescent based on her lack of public hair and small stature. The older female appears to be assaulting the minor by digitally penetrating the pre-pubescent minor with one hand and pulling the minor's hair with the other hand. The pre-pubescent minor appears to be fondling the older female's exposed right breast. Also there's a guitar.

That description, while accurate, provides nothing about the value inherent in the image. Indeed, the description is of the classical piece by Balthus called *The Guitar Lesson,* which the Seventh Circuit cited in *Griesbach* as "child erotica." On the right is an AI-created image of the same scene made to appear as a photo.

 

Again, the medium doesn't matter (AI versus watercolors) the image's value is the same. Yet, that's not captured when all you have is a vague description of sexual conduct; without more, the judge can't complete the obscenity analysis. After all, sex is not synonymous with obscenity.

The refrain could be: there's more going on in the previous image than just a sexual display that shows value. Maybe. But even if that was the response, it too misses the point. Again, the medium (AI versus photo paper) doesn't matter, nor does the presence of sex—what matters is the judge's ability to gauge whether the image is obscene. Think of it the terms of a search-warrant affidavit that provided the following:

> Law enforcement found a black and white image of a prepubescent minor male, fully nude, between 8-10 years of age. The minor is sitting on a chair staring at the camera. His legs are spread and his genitalia is fully exposed. The minor's nude body and genitalia are the focal point of the image.

That would be a completely accurate description of this image:

 

The one on the left is the original and the one on the right is AI-enhanced to appear as a painted portrait of the very same image—clearly AI can't match Mapplethorpe.

Again, that's a completely accurate description, but it's completely inadequate when it comes to evaluating the image's artistic worth. Indeed, the image fitting that description appears in the Getty Museum and it's featured in Sotheby's Mapplethorpe portfolio. Both images (photograph and AI) fit the description. But in neither case can the image be dismissed as obscene—the jury in Cincinnati certainly didn't think so, nor do Sotheby's or Amazon.[144] Yet none of that is conveyed by the description provided above.

Those three examples should make this point plain: the affidavit did not provide enough for the "searching inquiry" that the law demands—it cited child nudity and genitalia as the image's focus, noted it was AI generated, and considered the matter done. But it's not that easy. As the Supreme Court held in *Free Speech Coalition* in a quote that resonates here:

> Our society, like other cultures, has empathy and enduring fascination with the lives and destinies of the young. Art and literature express the vital interest we all have in the formative years we ourselves once knew, when wounds can be so grievous, disappointment so profound, and mistaken choices so tragic, but when moral acts and self-fulfillment are still in reach. Whether or not the films we mention violate the CPPA, they explore themes within the wide sweep of the statute's prohibitions. If these films, or hundreds of others of lesser note that explore those subjects, contain a single graphic depiction of sexual activity within the statutory definition, the possessor of the film would be subject to severe punishment without inquiry into the work's redeeming value. *This is inconsistent with an essential First Amendment rule: The artistic merit of a work does not depend on the presence of a single explicit scene.*[145]

---

[144] Alex Palmer, *When Art Fought the Law and Art Won*, SMITHSONIAN MAGAZINE (Oct. 2, 2015), https://tinyurl.com/48p8v7c4.
[145] 535 U.S. at 248 (emphasis added).

The search-warrant affidavit presented the opposite of what counts in obscenity cases—it only provided the court with the explicit element and nothing else. All the court had was that in each image a minor's penis was exposed—erect in two, and gripped in a third. Without more, without something that makes that scene into hard-core, patently offensive pornography that lacks serious value, the warrant could not issue, and the evidence must be suppressed.

### iii.   Beyond the First Amendment problems, the affidavit failed to tie Anderegg's home to the IP address when these images were shared.

Putting aside the First Amendment, the law is clear that a search warrant can only issue if the illegal material is tied to the place to be searched—it's the Fourth Amendment's nexus demand.[146] As this Court knows from *many* prior cases, IP addresses are dynamic—they change, sometimes every few minutes.[147] Hence the need for law enforcement to nail down precisely when an account was tied to an IP address.

Here, the search-warrant affidavit noted that potentially obscene materials were sent from a .74 IP address on October 7, 2023 at 9:36 pm CST and the same paragraph provides that the "target account" logged onto the .74 IP address on October 1, 2023 at 9:08 CST.[148] That is, if the materials sent are obscene then there's probable cause to believe that whoever was using the .74 IP address on October 7 at 9:36 pm is the one distributing this material and a search warrant can issue for his or her home. Yet, in the very next

---

[146] *Warden, Maryland Penitentiary v. Hayden*, 387 U.S. 294, 307 (1967); *United States v. One Residence & Attached Garage*, 603 F.2d 1231, 1233 (7th Cir. 1979).

[147] Aurelija Einoryté, *What is a Rotating IP Address, and How Does IP Rotation Work?* NordVPN, https://nordvpn.com/blog/what-is-ip-rotation/ (June 12, 2023).

[148] Ex. A. at 11–12.

HURLEY BURISH, S.C.

paragraph, when it came to finding out who used the .74 account on the critical dates and times, the investigators subpoenaed different dates and times.[149] They sent out a subpoena for who was using the .74 IP address on October 2, at 9:08 and October 8, at 9:36 pm. That is:

| Time of allegedly criminal behavior | Time .74 IP address used |
|---|---|
| October 7, 2023 at 9:36 pm CST | October 8, 2023 at 9:36 pm CST |
| October 1, 2023 at 9:08 CST | October 2, 2023 at 9:08 pm CST |

Put plainly, the officers never subpoenaed the IP address for when allegedly criminal behavior was actually happening.

In the parlance of probable cause, the investigators never tied Anderegg's computer or home to the sharing of those materials—they never established a nexus.[150] Given that IP addresses are dynamic and not static, the fact that it was within a day or so does not establish probable cause.[151] As one court put it, when "the property to be searched is a computer hard drive, the particularity requirement assumes even greater importance."[152] After all, we're not talking about 1428 Elm Street; the house getting mail at 1428 Elm Street address will weeks, months, even decades later be the same.[153] But IP addresses are not the same as physical addresses, they are different; they are (except in

---

[149] *Id.*

[150] *See United States v. One Residence & Attached Garage*, 603 F.2d at 1233 (7th Cir. 1979).

[151] Einoryté, *What is a Rotating IP Address, and How Does IP Rotation Work?* NordVPN, https://nordvpn.com/blog/what-is-ip-rotation/ (June 12, 2023).

[152] *United States v. Galpin*, 720 F.3d 436, 446 (2d Cir. 2013).

[153] *See id.*

HURLEY BURISH, S.C.

limited cases not present here) dynamic and can change every minute.[154] So there was not a basis to believe that the .74 IP address was actually tied to Anderegg's home when the material was allegedly distributed. Thus, not only did the search-warrant application not allow the issuing judge to engage in a "searching inquiry" on whether the images were obscene, the affidavit never tied the sharing of the offending images to Anderegg's account and therefore residence. For either (or both) reasons, the search warrant could not issue, and the evidence must be suppressed.

### B. Motion to Dismiss Counts Two and Three: the images that Anderegg allegedly distributed are not obscene.

In Counts Two and Three, the Indictment alleges that Anderegg distributed obscene materials on October 7, 2023. We know from the search-warrant affidavit what the images contained—it's all quoted above and the government has provided the precise image numbers and the reports that contain their descriptions. And after seeing the images, those are somewhat accurate (though vague) descriptions; the defense does (in Pretrial Motion Six) push back on the first two minors being described as "prepubescent"; they clearly young faces but also muscular development and pubic hair that puts them well, well outside the prepubescent stage. That is, this is AI, so you can't Tanner Scale the images. Tanner scale is, of course, a scale of physical development based on primary and secondary sex characteristics that medical and legal professionals use to estimate a child's age.[155] There is no way to do that with these images – block off the head and you have a

---

[154] Einorytė, *What is a Rotating IP Address, and How Does IP Rotation Work?* NordVPN, https://nordvpn.com/blog/what-is-ip-rotation/ (June 12, 2023).
[155] *See United States v. Red Legs*, 28 F.4th 931, 934 n.2 (8th Cir. 2022).

muscular (if a bit thin) 20-year-old body complete with pubic hair. But the age doesn't matter as much as the depiction.

Here, there is no way to consider the images that Anderegg allegedly distributed (and described above) and find that they are obscene materials. As a matter of law, a minor with an exposed penis doesn't cut it. Rather, as made clear in *Miller* the images must portray hard core, patently offensive sexual conduct. And whatever can be said about an exposed penis—flaccid, erect, or gripped—it ain't that.

This issue is one of the few where the court can step in and must make the initial call—read the book, look at the movie, see the image—and decide if this is (as a matter of law) enough.[156] As the Supreme Court in *Covington* observed in a different context, the procedure is proper when "trial of the facts surrounding the commission of [an] alleged offense would be of no assistance in determining the validity of [a] defense."[157]  That's because (like here), "courts may entertain motions that require it to answer only pure questions of law."[158]  And the Seventh Circuit has approved the use of this procedure in the appropriate circumstances.[159]

Here, the issue is whether these images constitute "obscene materials." It would be a waste to demand that the defense (and the Court) prepare for trial, bring a jury in, and then wait until the jury was sworn to move under Rule 29. As one district court

---

[156] *See P.J. Video, Inc.,* 475 U.S. at 873–74; *see also United States v. Miknevich,* 638 F.3d at 183.

[157] *United States v. Covington,* 395 U.S. 57, 60 (1969).

[158] *United States v. Pope,* 613 F.3d 1255, 1260 (10th Cir. 2010) (citing *id.*).

[159] *See United States v. Risk,* 843 F.2d 1059, 1061 (7th Cir. 1988); *see also United States v. Ponto,* 454 F.2d 657, 659 (7th Cir. 1971) (en banc) (upholding the grant of a pretrial motion to dismiss).

HURLEY BURISH, S.C.

observed when it granted a motion to dismiss over the government's objection: "Although the Government insists that the Court should wait until trial, the Court finds that such a delay is unwarranted and would constitute a waste of judicial resources."[160] The court continued, "[I]f this is [the Government's] evidence, it would be a directed verdict at the end, and I don't know why I have to sit through two or three weeks while you put on what we know the evidence will be. There doesn't seem to be a dispute of the facts in this case."[161] Indeed.

This case turns on whether the images qualify as obscene. And as set out above, they don't. They simply are not (and cannot be) the stuff of the hard core, patently offensive type that falls outside the First Amendment and can be prosecuted. For that reason, this Court must dismiss Counts Two and Three.

### C. Motion to Dismiss Counts One and Four: under *Stanley*, he had a right to possess and produce them within the confines of his home.

When it comes to Counts One and Four, the fight is not over the images—the government hasn't even stated what images it's contending are obscene. We've seen those that were submitted to the grand jury and they're not obscene. But, Counts One and Four should be dismissed for a more fundamental reason—because they fall under the First Amendment's protections of the home that *Stanley* articulated.

As noted above, *Stanley* does not provide any protections for activities *outside* the home. The Supreme Court has been absolutely clear on that.

---

[160] *United States v. Nitschke*, 843 F. Supp. 2d 4, 9 (D.D.C. 2011).
[161] *Id.* (quoting *United States v. Levin*, 973 F.2d 463, n.1 (6th Cir. 1992)) (emphasis added).

Hurley Burish, s.c.

- The First Amendment does not protect the distribution or sale of obscene material.[162]

- The First Amendment does not protect the importation, through a port of entry, of obscene material for private use.[163]

- The First Amendment does not protect the public exhibition of obscene material in public places even when minors are excluded from the premises.[164]

- The First Amendment does not protect the importation of obscene material for private use.[165]

- The First Amendment does not protect the transportation of obscene material on common carriers in interstate commerce.[166]

- The First Amendment does not protect the transportation of obscene material through the mail.[167]

The Supreme Court has *never* extended *Stanley* to activities outside the home and courts have refused to extend *Stanley's* rationale to places that might even seem "home like" — you can't possess obscene materials in a military barracks.[168]

Yet inside the home, *Stanley* controls. As the Supreme Court has observed: "*Stanley* did protect conduct that would not have been protected outside of the home."[169] And *Stanley* rests firmly (and explicitly) on the limitations of the government's ability to control activities *inside* the home: "the state … cannot constitutionally premise legislation

---

[162] *Reidel*, 402 U.S. at 355.

[163] *United States v. Thirty-seven Photographs*, 403 U.S. 363, 376 (1971).

[164] *Paris Adult Theater I v. Slaton*, 413 U.S. 49, 69 (1973).

[165] *Twelve 200-ft. Reels of Super 8mm. Film*, 413 U.S. at 128.

[166] *Orito*, 413 U.S. at 143.

[167] *Smith v. United States*, 431 U.S. 291, 307 (1977).

[168] *United States v. Bowersox*, 71 M.J. 561, 564 (A. Ct. Crim. App. 2012).

[169] *Bowers v. Hardwick*, 478 U.S. 186, 195 (1986) (overruled by *Lawrence v. Texas*, 539 U.S. 558, (2003)).

HURLEY BURISH, S.C.

on the desirability of controlling a person's thoughts."[170] The right to receive information, to "read or observe," and to "satisfy [one's] intellectual and emotional needs" inside the home are absolute.[171]

Here, those rights concern Anderegg's ability to think and create. Possessing and producing the materials at issue in this case are exercises of Anderegg's freedom of thought.[172] Anderegg has a right to think freely—even thinking obscene thoughts.[173] And Anderegg has a right to take those thoughts and express himself in creating these materials with AI just as much as he would with a needlepoint canvas or a charcoal pencil. When it comes to engaging in this sort of thought and expression, the Supreme Court in *Free Speech Coalition* was clear: "First Amendment freedoms are most in danger when the government seeks to control thought or to justify its laws for that impermissible end. The right to think is the beginning of freedom, and speech must be protected from the government because speech is the beginning of thought."[174] That, of course, speaks to Anderegg's ability to create and will into existence these thoughts by creating images at issue in Counts One and Four. He is free to think—whatever those thoughts are. And if he's free to express them with a paintbrush or a chisel, then he should also be able to create them with AI. Now, if the painting, the sculpture, or the AI generated image are

---

[170] *Stanley*, 394 U.S. at 566.

[171] *See id.* at 564–65.

[172] *Free Speech Coalition*, 535 U.S. at 253.

[173] LaFave, Substantive Criminal Law § 11.4 (2d. ed. 2016) ("Bad thoughts alone cannot constitute a crime.").

[174] 535 U.S. at 253.

truly obscene, he may not share them outside the home, but consistent with *Stanley* he can certainly possess and create them inside his own home.

The First Amendment's protection of Anderegg's right to possess and produce these images means that § 1466A is unconstitutional as applied to the prosecution of Anderegg's activities *inside* the home. As explained above, the First Amendment recognizes "a valid governmental interest in dealing with the problem of obscenity," but "*that interest cannot, in every context, be insulated from all constitutional protections.*"[175] As the Eleventh Circuit in *Ostrander* observed, the home is one of those contexts: "the First Amendment protects the private possession in one's own home of obscene material depicting *virtual* minors, so long as no real children are victimized."[176] There, the court rejected a facial challenge to § 1466A, finding that any overbreadth was not substantial when judged in relation to the statute's plainly legitimate sweep.[177] And the court (helpfully) distinguished the statute's *legitimate* sweep from *unconstitutionally* burdensome examples that would be problematic applications of § 1466A: creating an obscene digital comic strip in the confines of one's own home, private drawings or sculptures, and "legitimate works of art in progress."[178]

The legitimate sweep of § 1466A simply does not cover private possession and production of obscene materials within the home.[179] Since Counts One and Four rest

---

[175] *Stanley,* 394 U.S. at 563 (emphasis added).
[176] *United States v. Ostrander*, 114 F.4th 1348, 1362 (11th Cir. 2024) (citing *id.* at 256) (emphasis in original).
[177] *Id.* at 1362.
[178] *Id.* at 1363.
[179] *Id.*

HURLEY BURISH, S.C.

solely on activities that took place inside the home, *Stanley* dictates that § 1466A is unconstitutional as applied to these counts. Anderegg couldn't possess obscene material in his car or his cubicle at work or create them in a park or at a coffee shop, but he could at home.[180] Put differently and in terms of constitutional challenges, § 1466A is a valid exercise of congressional power in *all* regards except the home (as *Stanley* made clear) and thus those counts must be dismissed.

**D. Motion for *in Camera* Review of the grand jury instructions to ensure that the grand jury was properly charged.**

Here, the defense has set out why the images, especially those in Counts Two and Three, don't cut it as far as obscene materials go. The grand jury had to decide whether the images were obscene and that had to be done consistent with the *Miller* test. And given the arguments set out above, there is good reason to think that they were not properly instructed—how could an image of a juvenile's penis (in whatever state) be obscene? Yet here we are.

Anderegg has a Fifth Amendment right to face trial based on a properly instructed jury: "Neither instructions nor a petit jury verdict can satisfy after the fact the Fifth Amendment right to be tried upon charges found by a grand jury."[181] Naturally, information concerning the grand jury is veiled, with few exceptions, by absolute secrecy.[182] The proceedings and records are closed to the public.[183]  This is done for

---

[180] *Stanley,* 394 U.S. at 563.
[181] *United States v. Hooker*, 841 F.2d 1225, 1232 (4th Cir. 1988).
[182] Fed. R. Crim. Proc. 6(e)(2)(B); *see Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 218–19 (1979).
[183] *Douglas Oil Co.,* 441 U.S. at 218 n.9.

HURLEY BURISH, S.C.

several reasons: disclosure could discourage witnesses from coming forward; those about to be indicted would flee; and secrecy assures that those accused but exonerated by the grand jury will not be held up to public shame. Balanced against these three primary considerations, the Rules of Criminal Procedure layout several exceptions to the mandate for secrecy.[184]

Informed by the rules, stringent standards limit when disclosures should be made: "parties seeking disclosure of grand jury transcripts must show that the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed."[185] That standard has been read to require that the defense should show a "compelling necessity" or a "particularized need."[186] Yet, the standard remains "a highly flexible one, adaptable to different circumstances and sensitive to the fact that the requirements of secrecy are greater in some situations than in others."[187]

Here, the defense can satisfy all of the relevant criteria—both under the Rules and the case law. The Federal Rules allow for disclosure of grand jury proceedings "at the request of a defendant who shows that a ground may exist to dismiss the Indictment because of a matter that occurred before the grand jury."[188] If the grand jury was

---

[184] *Id.* at 219; *see also United States v. Procter & Gamble Co.*, 356 U.S. 677, 681–82 n.6 (1958).
[185] *Matter of Grand Jury Proceedings, Special Sept., 1986*, 942 F.2d 1195, 1198 (7th Cir. 1991).
[186] *Id.*
[187] *Hernly v. United States*, 832 F.2d 980, 984 (7th Cir. 1987) (internal quotations omitted); *see also United States v. Campbell*, 294 F.3d 824, 827 (7th Cir. 2002) (per curium).
[188] Fed R. Crim. P. 6(e)(3)(E)(ii).

HURLEY BURISH, S.C.

misinformed of the law, and thus returned charges that legally cannot amount to a federal crime—here, that the materials are not obscene—then grounds exist to dismiss them.[189]

And the mistake of law can come in many forms. For example, a mistake arose when, in response to question by a grand juror, a prosecutor offered an explanation of the law adverse to the defendant and contrary to leading Supreme Court ruling—an instruction the district court noted dealt with a "crucial over-arching legal question" and the consequence could be that "Government wrongly obtained the criminal indictment against this clergyman for exercising his First Amendment right" by so misleading the grand jury that it "no longer operated as an independent body."[190] Or in another case where the prosecutor erroneously stated, in response to a juror's question, that good faith reliance on the advice of counsel was an affirmative defense, to be presented "at trial," and therefore "irrelevant" to determining whether the elements of the crime are met.[191] That was, of course, error. Here, it's critical to know how the jury was instructed to view these images because it's impossible to believe that a properly charged jury would find the images to be patently offensive, hard-core pornography that "goes *substantially* beyond customary limits of candor and affronts contemporary community standards of decency."[192]

---

[189] *See, e.g., Hooker*, 841 F.2d at 1232.
[190] *See United States v. Cerullo*, 2007 WL 2683799, *8–11 (S.D. Cal. 2007).
[191] *United States v. Stevens*, 771 F. Supp. 2d 556, 567 (D. Md. 2011); *see also United States v. Breslin*, 916 F. Supp. 438, 445–46 (E.D. Pa. 1996).
[192] *Miller*, 413 U.S. at 31 (emphasis added) (quoting jury instructions).

Hurley Burish, s.c.

In some cases, the government responds that we give the grand jury the statute and that's enough. But the statute's text provides no assurance that the grand jury received a proper instruction of the nuanced law governing obscenity. While instructions to a grand jury need not be "crystal clear," they still must inform the grand jurors of the issues involved.[193]

Anderegg has the right to know that the grand jury found probable cause to believe that the images he allegedly possessed, produced, and distributed were obscene.[194] The failure to disclose the instructions may mean that he will have to stand trial for an act for which the grand jury never found probable cause. Additionally, disclosure must happen before trial. Otherwise, if he is convicted by a petit jury, that verdict "demonstrates *a fortiori* that there was probable cause to charge the defendants with the offenses for which they were convicted."[195] Thus, the defense has established a "compelling necessity" to avoid Anderegg's standing trial for a charge that a grand jury never found probable cause to believe he committed. And the defense has established a "particularized need" because the defense is merely seeking the grand jury's instructions. The defense has not asked for any of the testimony before the grand jury, just the charging instructions. While judges in Chicago may quip that a skilled prosecutor can indict a ham sandwich, the defense is confident that a properly charged grand jury would not indict

---

[193] *United States v. Overmyer*, 899 F.2d 457, 465 (6th Cir. 1990).
[194] *Stirone v. United States*, 361 U.S. 212, 215–17 (1960).
[195] *United States v. Mechanik*, 475 U.S. 66, 67 (1986).

Anderegg for images of a juvenile's penis or even one that's gripped—at least not under the proper reading of *Miller*.

This compelling necessity and particularized need must, of course, be balanced against the considerations that undergird the grand jury's need for secrecy. Those are not a trifle. Recall these concerns: disclosure could discourage witnesses from coming forward; those about to be indicted would flee; and secrecy assures that those accused but exonerated by the grand jury will not be held up to public shame.[196] But those points should not control here. First, there is no concern that Anderegg will flee. Second, the defense is not seeking any testimony with this motion; instead, the request is limited to *in camera* review of the instructions given to the grand jury. Third, Anderegg has already been indicted and faced public shame. There is, indeed, no prejudice to the government, the defense, or a third-party that would be implicated by having this Court review the grand jury instructions *in camera*. Thus, the defense has made a clear and definite showing of why the grand jury instructions are necessary and why he may be suffering prejudice because of an improperly instructed grand jury.

---

[196] *Douglas Oil Co.*, 441 U.S. at 219; *Matter of Grand Jury Proceedings, Special Sept., 1986*, 942 F.2d at 1199.

HURLEY BURISH, S.C.

**E. Motion for a Bill of Particulars to know precisely what images the government will argue are obscene.**

Under Rule 7, "[t]he court may direct the government to file a bill of particulars."[197] A bill of particulars is warranted when the indictment doesn't provide the defendant with adequate information to allow him to understand the charges against him, prepare his defense, protect against double jeopardy, and avoid unfair surprise at trial. In other words, its purpose is to provide "information necessary to permit the defendant to con- duct his own investigation."[198]

The Court already granted the oral motion for the government to identify the images in Counts Two and Three—they are the ones listed in the search warrant. But the defense also moves for a Bill of Particulars that identifies the images that the grand jury found were obscene in Counts One and Four and that the government will argue at trial are obscene. We need these to prepare for trial and allow our experts to prepare their reports. It cannot be that we get to trial and prepare to argue whether images A and B are obscene only to have the government pivot and bring in images C and D and there has been no expert report for images C and D.

This trial cannot be about surprise. It's about the First Amendment and whether the images are obscene under *Miller.* This will demand the views of experts, who must view the specific images and opine on whether the images lack serious value. That has to be done with full disclosures of expert reports and those reports have to be wedded to

---

[197] Fed. R. Crim. Pro. 7(f).
[198] *United States v. Smith*, 776 F.2d 1104, 1111 (3d Cir. 1985) (emphasis omitted).

the facts that will be argued at trial.[199] To ensure that happens and that there is no surprise, the government must identify what images the grand jury found were obscene as they pertain to Counts One and Four—for Anderegg can only be tried on *those* images.

## IV.    Conclusion

In the end, this is an interesting case. Smack dab between the First Amendment and criminal law, we have the first case in the country about AI-created obscenity. That might have some appeal for the press releases, but it ultimately doesn't matter that much. The law doesn't care whether the images were made with AI or a No. 2 pencil. The only question is whether the images are obscene. And semi-nude images of boys with their penises exposed may be many things, even child pornography if they're actual children, but it's not patently offensive, hard-core pornography that goes substantially beyond customary limits of candor and affronts contemporary community standards of decency. And if that's true—and it is—then the defense's motions must be granted, the evidence suppressed and the case dismissed.

Dated this 8th day of November, 2024.

Respectfully submitted,

STEVEN ANDEREGG, *Defendant*

*s/ Joseph A. Bugni*
Joseph A. Bugni
Wisconsin Bar No. 1062514
jbugni@hurleyburish.com
HURLEY, BURISH, S.C.
P.O. Box 1528
Madison, WI  53701-1528

---

[199] *See* Fed. R. Crim. Pro. 16(e)(ii).