UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

        *Plaintiff,*

    vs.                         Case No. 24CR50

STEVEN ANDEREGG,

        *Defendant.*

---

**REPLY BRIEF**

---

Joseph A. Bugni
*Wisconsin Bar No.* 1062514
Oliva P. Heiser (law clerk)
Hurley Burish, S.C.
33 E. Main Street, Suite 400
Madison, WI 53703
(608) 257-0945
jbugni@hurleyburish.com

# TABLE OF CONTENTS

I.    Introduction and overview of why the Court should grant the pretrial motions. ...................................................................................... 1

II.   The thematic and factual points that the government is mistaken about and that bear on the analysis of these motion ................................. 6

    A.    The flaw in the government's analysis flows from its attempt to conflate child pornography with obscene materials depicting virtual children. ....................................................................... 7

    B.    The government overstates the volume and photorealistic nature of these images.......................................................................... 10

III.  The principal flaws in the government's response to the defense's seven pretrial motions......................................................................... 13

    A.    Counts One and Four should be dismissed: the First Amendment protects Anderegg's right to possess and produce obscene material inside his home....................................................................... 14

        i.    Stanley does not just apply to "obscene material depicting adults." ..................................................................... 15

        ii.   Stanley protects activities within the home involving obscene materials regardless of what the images capture. .................. 19

        iii.  Interstate commerce has no relation to whether the First Amendment protects a person's privacy................................. 21

    B.    Counts Two and Three should be dismissed: the images are not patently offensive, hard-core pornography without any serious value. ................................................................................... 22

        i.    A motion to dismiss is the proper procedural mechanism to challenge the legal obscenity of these images. ...................... 23

        ii.   As a matter of law, images of boys' penises (without more) are not patently offensive, hard-core pornography...................... 26

    C.    The search warrant was not supported by probable cause and the evidence seized under it should be suppressed.............................. 27

        i.    P.J. Video illustrates that these descriptions were not enough for the Magistrate Judge to make a searching inquiry. ........ 28

HURLEY BURISH, S.C.

ii.    Anderegg's chats don't make it reasonable to believe that he had obscene images. ..................................................................31

iii.   The government needed to tie the IP address sharing the images to Anderegg's house for the warrant to issue. ..........34

iv.    The Court should hold a Franks hearing and establish that the images are not of prepubescent minors since they have pubic hair. ..................................................................35

v.     Good faith doesn't save the warrant.........................................36

D.    The Court can and should review in camera the grand jury instructions. ..........................................................................37

E.    The Court must allow the defense to have the images. ...................40

IV.   Conclusion. ..........................................................................41

Hurley Burish, S.C.

## I.    Introduction and overview of why the Court should grant the pretrial motions.

After over a hundred pages of briefing, it's important to come back to the very first sentences of the opening brief; this case turns on them:

> This case is not about child pornography: the rules and analysis for those cases don't apply here. This is all about obscenity and the First Amendment, and it's a much, much different framework.

Despite every word of that being true, the government has collapsed the legal distinctions between child pornography and obscenity. It does that by overreading the holdings of some cases, plucking out quotes from others, and reducing (at different points) questions of constitutional law to matters of policy. In its effort to escape the distinction between child pornography and obscenity, the government has adopted views of *Stanley, Free Speech Coalition,* and *Jenkins* that cannot be reconciled with the defense's or (for that matter) the Supreme Court's clear language. This Court will just have to read the cases—the opinions speak for themselves.

Just as the Court simply must read those decisions to see whose view of the law is right, so too it needs to look at the images. Both sides have said their piece. The Court simply has to look and see: are the images hard core, patently offensive pornography or are they simply weird images of boys with exposed penises. This is not a hard call. And the government's vehement assertion that these images are "patently offensive" doesn't make them so, any more than an image of a masturbating minor did in *Arthur*. Some pornographic images can be distasteful, even crude or unsettling, but that doesn't mean they are obscene.

Hurley Burish, S.C.

For that matter, the government calling something obscene doesn't mean that it can escape the scrutiny of a motion to dismiss and simply force the matter to trial. As it is with the government's other points, the Court simply has to read the cases and see if the defense is right. But to make that task easier, here's the quote from the Supreme Court in *Jenkins*, responding to the argument that obscenity is a pure factual call: "[I]t would be a serious misreading of *Miller* to conclude that juries have unbridled discretion in determining what is 'patently offensive.'" And it continued: "[W]e made it plain that under [*Miller*'s] holding 'no one will be subject to prosecution for the sale or exposure of obscene materials unless these materials depict or describe patently offensive 'hard core' sexual conduct." For its part, the government seems (at least in principle) to agree. In footnote 12, it states that if the image charged was a woman in a bathing suit, then we could bring the motion to dismiss. But it doesn't follow that *anything* short of a bathing suit would not trigger the same procedural protection—as though an image that would have been charged in 1925 can be the only means of dismissal in 2025.

Rather, the Court has to ask if, under *Jenkins*, would a still (or an AI-created) image of Brooke Shields from *Blue Lagoon* be shielded from a motion to dismiss? What about the scene from *The Lovers,* the movie at the heart of the I-know-when-I-see-it line? There are scores of images and movies that some court, somewhere, at some time long ago would have found obscene but which clearly are not hard core, patently offensive material. Does the defense have to wait for a jury to be impaneled before such an image can be challenged? Nonsense. However the government wants to frame the law and describe the images, the bottom line is this: no matter how unsettling the images may be, they

can't be deemed hard core, patently offensive pornography. They just aren't. They're AI generated images of nude boys with exposed penises. That's it.

That point also bears on the search warrants. In defending them, the government cites *P.J. Video* for reducing the demand for probable cause in obscenity cases to nothing more than "briefly describing hours-long videos as showing 'fondling and cunnilingus,' 'intercourse,' and 'fellatio.'" Thankfully, we don't have to take the government's spin on the affidavits in *P.J. Video*, the Supreme Court put them in the appendix. They're a page long, giving details of the hours-long movie capturing incestual and graphic sex between father and daughter, mother and son, and an orgy—the whole thing is quoted on page 30. To put it charitably, the government grossly underreads *P.J. Video* and the gross details that an affidavit must contain.

The government's cribbed reading of Supreme Court precedent extends to how it reads *Stanley*. Rather than reading *Stanley* with regards to what it says and how it's stood for sixty years, the government wants to reframe *Stanley* as only addressing adult pornography. As with the other cases, the Court simply has to read *Stanley* to see it was not limited to materials depicting adults. The opinion provides a fundamental privacy right inside the home, which later Supreme Court decisions made clear: "*Stanley* depended, not on any First Amendment right to purchase or possess obscene materials, but on *the right to privacy in the home*."

In addition, the defense has not found *any* case embracing the government's *very* fine distinctions between adult and child obscenity. Sure, the cases talk about obscenity depicting adults because that was the movie or magazine at issue; if the images contained

*actual* kids they'd be analyzed under *Ferber*. But obscenity is just obscenity. It's not protected speech. It can be prosecuted if it involves adults or animals; it can be prosecuted if it's images or words. We don't have multiple tests. We have the single question: does it fall outside *Miller*? If it is patently offensive, hard-core pornography with no serious worth, it's not protected and can be criminalized; if it is not patently offense, hard-core pornography, it's cloaked by the First Amendment—regardless of what's displayed.

To escape those protections and justify these images being treated differently, the government invokes various policy considerations. But in the fifty years since *Miller,* this Court should not be the first to pollute the First Amendment analysis with policy. Nor should this Court be tempted to ignore the First Amendment's protections because of how the government characterizes the images and Anderegg. These motions—this case— should be settled on questions of the law and whether the images violate the law. It should not and cannot be decided on the question of whether the Court thinks Anderegg is gross and his behavior disturbing. As the Supreme Court has made abundantly clear, words and images that society may greet with moral condemnation are still protected by the First Amendment: "[s]exual expression which is indecent but not obscene is protected by the First Amendment."

To the extent that the Court holds fast to the law, this case should be over. *Stanley* means Counts One and Four must be dismissed because those actions all took place inside the privacy of Anderegg's home. The images in Counts Two and Three (described in the search warrant) are simply not obscene and so those counts cannot survive. And, for that matter, the search warrants did not provide probable cause given the paucity of

Hurley Burish, S.C.

details about the images' obscene nature, the problems with the images' description (prepubescent boys with pubic hair and muscular development), and the inability to tie the IP address to Anderegg's home. Further, in conducting the Court's independent review of the obscenity question, there is no reason that it should not examine the grand jury instructions. In a question as weighty and important as this, it's critical that the Court have confidence that the grand jury was properly instructed. Finally, if this case survives these motions, the defense must have the images in order to prepare for trial. Thus, for the reasons more fully expressed below, the defense respectfully requests that the Court grant the defense's seven pretrial motions.

Hurley Burish, S.C.

## II.     The thematic and factual points that the government is mistaken about and that bear on the analysis of these motions.

Before tackling the most salient points in the government's brief, it's important to address a few overarching problems with its position. It begins with the flawed analysis alluded to above—*Stanley* doesn't mean what it says, and *Miller* only somewhat applies to obscene images of virtual children.[1] In deviating from precedent, the government's problems start right away by conflating obscenity with child pornography. They're not the same. Indeed, *Ferber* was a movie capturing two minors masturbating; the Court didn't condemn it as obscene, but rather as capturing the sexual abuse of kids.[2] Despite that reality, the government wants virtual images (where there is no sexual abuse of an *actual* child) to be treated the same way as *Ferber* treats the actual abuse of a child.[3] They're not the same. And since *Free Speech Coalition*, that's been clear: "In contrast to the speech in *Ferber*, speech that itself is the record of sexual abuse, the CPPA prohibits speech that records no crime and creates no victims by its production. *Virtual child pornography is not 'intrinsically related' to the sexual abuse of children*, as were the materials in *Ferber*."[4]  So a different analysis applies: *Miller*.[5]

What's more, not only were the images at issue here not produced with real children, they are also not "photorealistic"—whatever that term is supposed to mean. No one has *ever* thought that these were images of actual children—not Instagram and

---

[1] *See* R.64:16, 19–20, 27.

[2] *See New York v. Ferber*, 458 U.S. 747, 753, 761 (1982).

[3] *See* R.64:16.

[4] 535 U.S. 234, 250 (2002) (emphasis added).

[5] *Id.*

Hurley Burish, S.C.

certainly not law enforcement. Yet the government argues that it was an open question until now and, *after investigation*, it has deduced otherwise.[6] The investigation could not have lasted longer than the time it took to glance at the images—they self-evidently are not real children. Nor are they photorealistic as the government repeatedly posits, any more than the AI generated images embedded in the opening brief of the *Birth of Venus* and *The Guitar Lesson* are. Sure, they're made to look more like a photo, but they don't leave anyone wondering how the defense scored a time machine to antiquity.

> **A.    The flaw in the government's analysis flows from its attempt to conflate child pornography with obscene materials depicting virtual children.**

The government's brief is well-written—no question. And it's easy to get swept along in its assertions and rhetoric, especially as they seem backed up with parentheticals and *see* citations. But given a modicum of scrutiny, the cites and the logic fall apart. This happens in two main parts of its argument.

To start, instead of embracing the Supreme Court's precedent on obscenity and virtual images of children, the government brushes off *Free Speech Coalition* and *Stanley,* and flips the analysis by analogizing this case and these questions to *Osborne,* which dealt with child pornography:

> Instead, the need to criminalize the in-home possession and production of obscene materials depicting children is materially similar to the interests that the Supreme Court credited in *Osborne*, which held that there is no First Amendment right to possess child pornography, *Stanley* notwithstanding.[7]

---

[6] R.64:19, n.10.
[7] R.64:15.

Hurley Burish, S.C.

From that point on, its argument (and this case) is no longer about obscenity, it's all about extending the rationale used in child pornography cases to this obscenity case. As the brief goes on, the government doubles down on making this case all about child pornography:

> As the foregoing discussion illustrates, the application of § 1466A to the in-home possession and production of obscene material involving children is much more like *Osborne* than it is *Stanley*. And for the same reasons that the Supreme Court held in *Osborne* that neither the First Amendment nor Stanley provide any right to possess "child pornography," so should this Court hold that neither the First Amendment nor *Stanley* provide any right to possess obscene materials depicting children.[8]

That point is then followed up with six pages of policy arguments for treating these images the same as child pornography.[9]

The problem with the government's argument is twofold. One, you can't abandon the Supreme Court precedent with a line like: "*Stanley* notwithstanding."[10] *Stanley* withstood, and it withstands. Two, *Free Speech Coalition* controls. There, the Court dealt with virtual child pornography, and it was clear: *Miller* applies.[11] But more than that, *Free Speech Coalition* dealt with *all* of the government's purported policy reasons for treating virtual images as real child pornography. And it rejected them. "[W]here the speech is neither obscene nor the product of sexual abuse, it does not fall outside the First Amendment's protection."[12]

---

[8] *Id.* at 16.
[9] *Id.* at 16–21.
[10] *Id.* at 15.
[11] *Free Speech Coalition*, 535 U.S. at 246.
[12] *Id.* at 239.

Hurley Burish, S.C.

That should be the end of it. But the government spends so much of its brief on this, it's best to completely wipe out any chance that those distinctions would be lost. The government offers four reasons for why *Stanley* shouldn't apply here: first, offenders could use AI-generated minors to groom or entice children; second, it increases the demand for child pornography; third, advancing technology makes it harder to prove that illicit images depict real children; and fourth, it interferes with legitimate victim rescue efforts.[13] *Free Speech Coalition* addressed and rejected each of those policy reasons, the quotes on the right are from the opinion:

| Rationale | What the Supreme Court had to say about it |
| --- | --- |
| Offenders could use AI-generated minors to groom or entice children | "[T]he Government may not prohibit speech on the ground that it may encourage pedophiles to engage in illegal conduct."[14] |
| Market deterrence theory | Rejecting this theory because if virtual images were "indistinguishable" from real images then "the illegal images would be driven from the market by the indistinguishable substitutes," *reducing* the demand for pornography that depicts actual children.[15] |
| Technology makes it harder to prove the images depict real children | Restricting an individual's "right to read or observe what he pleases … may not be justified by the need to ease the administration of otherwise valid criminal laws."[16] |
| "Photorealistic" depictions interfere with legitimate victim rescue efforts | "The necessary solution, the argument runs, is to prohibit both kinds of images. The argument, in essence, is that protected speech may be banned as a means to ban unprotected speech. This analysis turns the First Amendment upside down."[17] |

---

[13] R.64:17–20.

[14] *Free Speech Coalition*, 535 U.S. at 253–54.

[15] *Id*. at 254.

[16] R.64:10 (quoting *Stanley v. Georgia*, 394 U.S. 557, 566, 568); *id*.

[17] *Free Speech Coalition*, 535 U.S. at 254–55.

Hurley Burish, S.C.

In the end, it's important to remember that virtual substitutes for child pornography don't undermine *Free Speech Coalition*'s conclusions that *Miller* controlled— they bolster it. As the Court wrote, *Ferber* did not hold that child pornography is categorically without value. "On the contrary, the Court recognized some works in this category might have significant value[.]"[18] The Court relied on the availability of substitutes "as an alternative and permissible means of expression."[19] This critical distinction between pornography that depicts actual children and pornography that does not was "not only referred to" in *Ferber* but "relied on … as a reason supporting its holding."[20] If more is needed to reject the government's argument that *Stanley* and *Miller* don't apply, the Court simply has to read *Free Speech Coalition*.

### B. The government overstates the volume and photorealistic nature of these images.

With the logical flaw of conflating obscenity with child pornography, the government also adopts the position (and trumpets the theme) that "photorealistic" images are different.[21] They're not. For one, *Free Speech Coalition* dealt with images that the Court described as "*virtually indistinguishable*" from child pornography.[22] It's unclear what the government means by "photorealistic," but even taken in the most demanding way, it can't mean more than *virtually indistinguishable*. And these images aren't virtually indistinguishable. Anyone looking at them can see they might be made to look more like

---

[18] *Id.* at 251.
[19] *Id.*
[20] *Id.*
[21] R.64:19–20.
[22] *Free Speech Coalition*, 535 U.S. at 249.

Hurley Burish, S.C.

a photo, but no one (with decent eyesight) would look at the charged images and think they are real. And again, obscenity doesn't turn on how much an image looks realistic; the medium doesn't matter—charcoal, fresco, AI, or film—it's all the same, it's whether the image's content is hard core, patently offensive pornography without any serious value.[23]

What's more, the government may be overstating (a tad) the volume and content of the images. It notes that there were "13,000 GenAI images, *many of which depict nude or semi-clothed prepubescent minors lasciviously displaying or touching their genitals*."[24] Respectfully, there are some that are disturbing and capture what the government describes—certainly. But *not* many. Having spent an afternoon of one's life going through all 13,000, there are probably a hundred or so—give or take. But whether it's 13 or 13,000, that doesn't really matter; instead, the government's point is an atmospheric detail, with no impact on the legal issue; it only serves to make Anderegg seem gross. But (again) the First Amendment doesn't just apply to what's socially acceptable; rather, "[s]exual expression which is indecent but not obscene is protected by the First Amendment."[25]

In addition, the government inserts another stray atmospheric into the brief—namely, that Stable Diffusion was trained on child pornography and therefore this is by extension child pornography.[26] For one, we don't know that. And to the extent the government wants this case to hang in total or part on that theory, we would request an

---

[23] R.52:13.
[24] R.64:6.
[25] *Sable Communications v. FCC*, 492 U.S. 115, 126 (1989).
[26] R.64:23, 39, 45.

evidentiary hearing on the issue and test those claims. Second, the issue in this case is not AI. That may have been what caught the press's attention, but the issue is the images' content—not the medium of creation or expression. There is no AI carveout to the First Amendment. The question is the same for any medium, and it is the only question that *Miller* asks: is the image of hard core, patently offensive pornography that lack serious value.[27]

Those thematic points pervade the government's brief in response. But once the Court accepts that *Free Speech Coalition* dealt with virtually indistinguishable images of children and said *Miller* applies, then there is not much purchase to the government's arguments that these images should be treated differently. Keeping those two central points in mind, the rest of this brief addresses the government's particular arguments towards each motion.

---

[27] *Miller v. California*, 413 U.S. 15, 24, 31, n.2 (1973).

### III.    The principal flaws in the government's response to the defense's seven pretrial motions.

The Court has a lot to work through in the pretrial motions; rather than keeping with the structure of the opening brief, which went sequentially through the motions, the rest of this brief follows the government's structure. First, it addresses the government's arguments about whether *Stanley* provides a privacy right to the home for obscene materials. The government says no, but the Supreme Court in *12,200-ft. Reels* said yes: *Stanley* depended "on the right to privacy in the home."[28] Second, it addresses whether this Court can rule (as a matter of law) on whether the images in Counts Two and Three are obscene. The government says no, but the Supreme Court in *Jenkins* said: "[W]e made it plain that under [*Miller*'s] holding 'no one will be subject to prosecution for the sale or exposure of obscene materials unless these materials depict or describe patently offensive 'hard core' sexual conduct.'"[29]

Moving to the suppression issue, the defense's opening brief focuses on whether the descriptions in the search warrant pass muster under *Marcus*. The government says yes and cites *P.J. Video* as simply requiring a short description of sexual acts. But in *P.J. Video,* the Court affirmed that *Marcus* controlled and it approved of affidavits that say much, much more than what the government represents and far, far more than what was provided here. The government's ancillary arguments for upholding the warrant rest on the idea that Anderegg has an abiding and deviant interest in children, so that's enough

---

[28] *United States v. 12,200-ft. Reels of Super 8mm Film*, 413 U.S. 123, 126 (1973).
[29] *Jenkins v. Georgia*, 418 U.S. 153, 159 (1974) (quoting *Miller*, 413 U.S. at 25).

to believe illegal images would be found. That logic has been rejected time and again.[30]

A person's private fantasies do not give the government license to assume that they can

get a search warrant without probable cause of an *actual* crime to be found in a *particular*

place.[31]

Finally, the government doesn't want to expose the grand jury instructions to the

Court, but its case law is not as strong as it suggests since the defense is not asking to see

it—we just want the Court to review it. If the instructions accurately state the law, fine; if

not, the case would have to be dismissed. And the government says the images are either

child pornography or contraband or maybe both and can't be turned over to the defense.

But these images are neither child pornography, nor are they contraband. And they are

necessary for the defense to prepare for trial. Each of those points is addressed below.

### A.     Counts One and Four should be dismissed: the First Amendment protects Anderegg's right to possess and produce obscene material inside his home.

*Stanley* protects everyone's freedom to engage with obscene materials, so long as

it's within the privacy of the home. The defense agrees that *Stanley* is narrow; the opening

brief established all the places it doesn't apply.[32] It protects a singular place: the home.

Yet in the government's reading, *Stanley* protects only the predilections captured in the

movies Stanley actually possessed: "nude men and women engaged in acts of sexual

intercourse and sodomy."[33] But that cribbed reading of *Stanley* cannot be squared with

---

[30] *United States v. Falso*, 544 F.3d 110, 122 (2d Cir. 2008).

[31] *See id.*

[32] R.64:12–14; R.52:39–41.

[33] *Stanley v. Georgia*, 224 Ga. 259, 161 S.E.2d 309 (1968).

the Court's language and how it's been interpreted. To that end, *Stanley* protects possessing and producing obscenity of all subject matter—adults, children, animals; films, sculpture, and drawings.

### i. *Stanley* does not just apply to "obscene material depicting adults."

The most important point is that *Stanley* applies to obscenity categorically, not a particular sub-type. The government described the key issue in *Stanley* as follows: "*Stanley* is best understood as limited to the question before the Court—whether adults have a First Amendment right to the in-home possession of obscene material depicting adults—and not to the materially different question whether such a right exists as to obscene and sexually explicit material depicting children."[34] But that's not an accurate recitation of the question presented in *Stanley.* The question presented was all about privacy. Here's a screenshot of the question presented.

It says nothing about being limited to adult content. Obscenity includes material depicting adults, material depicting minors that are not actual children, material depicting sadomasochism, material depicting bestiality, even (sadly)

> 5. Whether the State may constitutionally punish Appellant for the *knowing* possession of motion picture films depicting sodomy, nudity and sexual intercourse, which constitute "hard-core pornography", where there was sufficient circumstantial evidence to authorize the trial jury to conclude that he knew of the obscene nature of said films and was preparing to exhibit them to a group of adult guests in his home, although there was no evidence to indicate that he had permitted juveniles to view them, or was "pandering" them to the general public.

---

[34] R.64:12.

Hurley Burish, S.C.

materials involving animal abuse.[35] In a word, anything that is obscene is protected *inside* the home.[36]

No court has limited (or categorized) obscenity the way the government seeks to. In the cases the government cites as limiting *Stanley*, it provides a litany of parentheticals with the phrase "depicting adults."[37] But the qualification (depicting adults) in those cases concerned distinguishing child pornography, not one type of obscenity from another.[38] Reading the cases, it's clear that the plucked out quotes the government uses are just shorthand to mean: not pornography produced using actual children.

This chart compares the government's short version of quotes with the context needed to show what they were really dealing with.

---

[35] *See, e.g.*, 18 U.S.C. § 48; *United States v. Richards*, 755 F.3d 269, 277 (5th Cir. 2014).
[36] *Miller*, 413 U.S. at 23–25.
[37] R.64:12–14.
[38] *Id.*

HURLEY BURISH, S.C.

| What the Government Says It Says | What It Actually Says |
|---|---|
| *Stanley* held that the government "may not criminalize the mere possession of obscene material involving adults." R.64:14. | "The broad authority to proscribe child pornography is not, however, unlimited. … *[T]he child-protection rationale for speech restriction does not apply to materials produced without children.*"[39] |
| First Circuit case cited *Stanley* for the proposition that "the Supreme Court has held that states cannot regulate the private possession of adult obscenity." R.64:14. | "[W]e do not intend to express any view regarding as-applied challenges to statutes relating to the regulation of adult pornography."[40] |
| Third Circuit case distinguishing between "obscenity depicting adults" in *Stanley* and "child pornography." R.64:14. | "The use of *children as subjects* of pornographic materials is harmful to the physiological, emotional, and mental health of the child."[41] |
| Sixth Circuit case describing *Stanley* as applying to "sexually explicit material featuring adults." R.64.14. | "While it is true that private possession of sexually explicit material featuring adults is deemed to be a constitutional right, Mr. Kussmaul was convicted of using the mails illegally, not of possessing obscene material."[42] |
| "In *Stanley*, the Court found that the first amendment protected private possession of obscene adult material in the home." R.64.14. | "In *Stanley*, the Court found that the first amendment protected private possession of obscene adult material in the home. However, more recently in *New York v. Ferber*, the Court recognized that 'classifying child pornography as a category of material outside the protection of the First Amendment [was] not incompatible with [its] earlier decisions.' We need not discuss this issue further[.]"[43] |

---

[39] *United States v. Williams*, 553 U.S. 285, 289 (2008).

[40] *United States v. Morales-de Jesus*, 372 F.3d 6, 18 n.9, 10 (1st Cir. 2004) (internal citations omitted).

[41] *United States v. Knox*, 32 F.3d 733, 750 (3d Cir. 1994) (emphasis added) (internal citations omitted).

[42] *United States v. Kussmaul*, 987 F.2d 345, 350 n.5 (6th Cir. 1993) (internal citation omitted).

[43] *United States v. Richardson*, 856 F.2d 644, 647–48 (4th Cir. 1988).

The government's attempt to craft distinctions within obscene materials has no force when you read the *whole* opinion. But more than pulling apart the government's cites, it's important to circle back to *Free Speech Coalition* and what it observed about obscene materials involving virtual minors: "Pictures of what appear to be 17-year-olds engaging in sexually explicit activity do not in every case contravene community standards."[44] That is, neither the Supreme Court, nor any court, for that matter, has adopted age-related distinctions for obscene materials. Instead, it's (as the defense has argued throughout) the image's content that controls. The question is not whether the virtual person depicted appears eight or eighteen (pre-pubescent or post-pubescent), but what they are depicted doing. If it's hard-core, patently offensive pornography without serious worth, then it's not protected—regardless of the birthday.

Put another way, the rationales for restricting pornography that involves actual children don't apply to other types of pornography—that much is very clear. But neither the Supreme Court, nor any court, has sliced sub-categories of obscenity as the government seeks to do here.[45]  *Stanley* and the protection it provides were limited to a particular place, not a particular type of obscenity, a point the Court made clear: "Whatever may be the justifications for other statutes regulating obscenity, we do not think they reach into the privacy of one's own home."[46]

---

[44] *Free Speech Coalition*, 535 U.S. at 246.
[45] R.64:14.
[46] *Stanley*, 394 U.S. at 564.

HURLEY BURISH, S.C.

ii.  *Stanley* **protects activities within the home involving obscene materials regardless of what the images capture.**

The government does all it can to reframe and read out the clear language of *Stanley.* But it can't. *Stanley* rests on a privacy interest in the home: "*Stanley* depended, not on any First Amendment right to purchase or possess obscene materials, but on the right to privacy in the home."[47] Whether it's a First Amendment or Substantive Due Process right, it's a Supreme Court holding. The government cannot escape that within his own home, Anderegg is free to do as he will with obscene materials. He can't receive them, and he can't distribute them, but inside the privacy of his home, he's free from prosecution.

Ignoring that precedent, the government dismisses *Ostrander* as misplaced because the defendant there was unhoused (therefore couldn't possess obscenity in his home) and raised a facial overbreadth challenge.[48] But those differences illustrate why *Ostrander* is actually on-point: here, the conduct was undertaken in a home; and here, the defense has raised an as-applied challenge.[49] And when the conduct is in the home and it's an as-applied challenge, the Eleventh Circuit agreed that § 1466A "proscribes some conduct that may be constitutionally protected."[50] It reached that conclusion after walking through the key obscenity cases and noted that "the First Amendment protects the private possession in one's own home of obscene material depicting *virtual* minors,

---

[47] *12,200-ft. Reels of Super 8mm Film*, 413 U.S. at 126.
[48] R.64:26.
[49] R.52:45–46.
[50] *United States v. Ostrander*, 114 F.4th 1348, 1360 (11th Cir. 2024).

Hurley Burish, S.C.

so long as no real children are victimized."[51] That's *exactly* the case here. *Ostrander* can't be cast aside as inapposite; instead, it should reassure the Court that *Stanley* remains good law and must be followed.

The defense acknowledges that applying *Stanley* to producing obscenity would be an extension of *Stanley*. *Stanley* dealt with "possession." But extending the protection of the home to production is not an unwarranted extension. After all, *Stanley* provides a geographic privacy protection: the home.[52] And it accords with the history and tradition of heightened First Amendment protection within the home: "A special respect for individual liberty in the home has long been part of our culture and our law, that principle has special resonance when the government seeks to constrain a person's ability to speak there."[53] After all, the First Amendment would protect a person's ability to write an obscene story inside their home. A person can't publish it or send it in the mail, but they can compose it inside the privacy of their study. By the same token, a person could paint an obscene image or draw an obscene comic at their kitchen table. Just so long as the obscene image doesn't leave the home, the right to privacy attaches.[54]

Not surprisingly, the Court in *Ostrander* acknowledged that creating images inside the home would be protected by the First Amendment, but dismissed the facial challenge to the statute noting that there was no realistic indication someone would be charged for producing images in their own home:

---

[51] *Id.* at 1361 (emphasis in original).
[52] *Stanley*, 394 U.S. at 565.
[53] *City of Ladue v. Gilleo*, 512 U.S. 43, 57 (1994) (internal citation omitted). *See* R.52:24.
[54] *See Stanley*, 394 U.S. at 565.

HURLEY BURISH, S.C.

> For one thing, Ostrander suggests that the statute could cover a person's private 'doodle[s], draw[ing], caricature,' or sculpture. Ostrander also offers that the statute might conceivably cover a hand-drawn or private digital comic strip. Although Ostrander is right that these situations could conceivably be covered by the text of the law, he has not demonstrated any realistic indication that the statute would actually be used to prosecute someone simply for making an obscene doodle in the confines of his own bedroom, in his home.[55]

That is, the court acknowledged that a prosecution for production of obscene materials in the home would be unconstitutional—if that were the case before it.[56] The hypothetical that *Ostrander* noted was too remote and unrealistic is precisely what we have here: charging a person for producing images in his own home. It doesn't matter if it was doodles or comics or sculptures or AI, what matters is it was inside the home.  And inside the home, the First Amendment and *Stanley* provide complete protection—leave the home and it disappears, but inside the home it is absolute.

### iii.    Interstate commerce has no relation to whether the First Amendment protects a person's privacy.

As a final means of escaping *Stanley's* geographic barrier around the home, the government introduces the idea that the jurisdictional element takes this out of *Stanley's* reach. It reasons that under § 1466A, the computer (or the pencil or the chisel) had to cross state lines. So it's different. But that misses the point; this isn't a question of federal jurisdiction. The interstate nexus gives Congress authority to legislate and the federal government authority to prosecute, but the power to prosecute does not undercut (or override) an otherwise-guaranteed constitutional protection. [57]

---

[55] 114 F.4th at 1363.
[56] *Id.* (cleaned up) (quoting *Hill v. Colorado,* 530 U.S. 703, 733 (2000).
[57] *See United States v. Johnson*, 42 F.4th 743, 746–48 (7th Cir. 2022).

Hurley Burish, S.C.

No one would believe that a newspaper wouldn't have First Amendment rights just because the printing press was from out-of-state or (for that matter) that an individual wouldn't have a First Amendment right to blog because the computer was manufactured out-of-state. By the same token, there is simply no basis to argue that Anderegg's computer coming from out-of-state means that *Stanley* doesn't apply. Indeed, it's hard to imagine that the Kodak Eastman 8MM film that Stanley's porno was captured on had been manufactured in the great state of Georgia.

In sum, the Court should apply *Stanley* to Anderegg's conduct in his home—possessing and producing obscene materials. It should reject the government's argument that *Stanley* doesn't apply to materials involving virtual children. And it should reject the argument that the interstate nexus element robs Anderegg (or anyone) of the protections offered by the First Amendment.  Thus, Counts One and Four must be dismissed.

### B.    Counts Two and Three should be dismissed: the images are not patently offensive, hard-core pornography without any serious value.

The defense has set out the myriad cases where courts have taken the step of dismissing an indictment—albeit (and admittedly) in different contexts. In response, the government argues that obscenity is a pure fact question.[58] But as the Supreme Court said in *Jenkins* (and as the government quotes only in part), the factual components do not insulate the question from an independent review: "Even though questions of appeal to the prurient interest or of patent offensiveness are essentially questions of fact, *it would be a serious misreading of Miller to conclude that juries have unbridled discretion in determining*

---

[58] R.64:29–30.

Hurley Burish, S.C.

*what is patently offensive. … [W]e made it plain that under that holding no one will be subject to prosecution for the sale or exposure of obscene materials unless these materials depict or describe patently offensive hard core sexual conduct.*"[59] These images fail the *Miller* test and cannot be deemed legally obscene. And nothing stops this Court from exercising its independent duty to review and decide that these images are not obscene.

### i.    A motion to dismiss is the proper procedural mechanism to challenge the legal obscenity of these images.

*Jenkins* makes it clear that a motion to dismiss is the proper procedural mechanism to challenge the prosecution's *legal* theory. This question cannot wait for trial. Indeed, in *Free Speech Coalition* an affirmative defense at trial could not save an unconstitutional prosecution because "[a]n affirmative defense applies only after prosecution has begun, and the speaker must himself prove, on pain of a felony conviction, that his conduct falls within the affirmative defense."[60] So too here. The constitutional issue is a legal question, and it can be resolved by a motion to dismiss. Although the *Miller* test has factual elements, the elements work together to create a "legal conclusion" that is a constitutional question that courts review independently.[61]

In cases of such constitutional import as free speech, the Supreme Court has "repeatedly held that an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not

---

[59] *Jenkins*, 418 U.S. at 160 (cleaned up) (emphasis added).
[60] *Free Speech Coalition*, 535 U.S. at 256.
[61] *See United States v. Ragsdale*, 426 F.3d 765, 782 (5th Cir. 2005).

HURLEY BURISH, S.C.

constitute a forbidden intrusion on the field of free expression.'"[62] To that end, the Seventh Circuit has agreed that the constitutional "considerations at stake are sufficiently weighty to make abandonment of review by this court undesirable."[63] This applies across the board in First Amendment challenges: "The question whether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact. *Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold*[.]"[64]

The central point is First Amendment issues are different. And it's not enough to say: the jury will decide and that's that. After all, for a supposed question of "fact," obscenity cases sure get a whole lot of appellate ink and a whole lot of reversals.[65] That's because, at its heart, obscenity is a question of fact *after* the constitutional threshold has been satisfied. And the constitutional threshold can never be ignored or pushed off until later—it permeates the entire case.

To that end, the cases the government cites as barring dismissal, when viewed in their entirety, ultimately say nothing different. For example, in *Ragsdale* the court said this:

---

[62] *Bose Corp. v. Consumers Union*, 466 U.S. 485, 499 (quoting *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 284–86 (1964))

[63] *United States v. Various Articles of Merchandise, Seizure No. 170*, 750 F.2d 596, 598 (7th Cir. 1984).

[64] *Bose Corp. v. Consumers Union*, 466 U.S. at 511 (emphasis added).

[65] *E.g., Jenkins*, 418 U.S. 153; *Cain v. Kentucky*, 397 U.S. 310 (1970); see e.g., Jeffery Stone, *Sex and the First Amendment: The Long and Winding History of Obscenity Law*, 17 Fist Amend. L. Rev. 134 (2018).

> *The Supreme Court has rejected the suggestion that whether a work is obscene is a factual judgment and jury findings of obscenity are all but conclusive. … [T]he question whether a particular work is obscene necessarily implicates an issue of constitutional law.* The Court stated that to allow jury verdicts to be all but conclusive in this area would be an abnegation of judicial supervision in this field [] inconsistent with our duty to uphold the constitutional guarantees.[66]

And the Court continued on that point by quoting Justice Harlan's concurrence in *Roth*.

> I do not think that reviewing courts can escape this responsibility by saying that the trier of facts, be it a jury or a judge, has labeled the questioned matter as "obscene," for, if "obscenity" is to be suppressed, the question whether a particular work is of that character involves not really an issue of fact but *a question of constitutional judgment of the most sensitive and delicate kind.*[67]

As discussed at length in the opening brief, obscenity demands sensitive tools: "careful procedural safeguards."[68] And to be *very* clear on this, the government is completely right: the defense does not have an on-point district court case dismissing the indictment. That could be for many reasons. But the bottom line is a pretrial determination makes perfect sense. Even the government agrees it would be a different case if it was an image of woman in a swimsuit.[69] But that just begs the question: either the Court can entertain a motion or it can't. And that power doesn't turn on whether the image captures a woman in a bathing suit or a nude minor—it may make the decision to dismiss easier, but it doesn't change whether the procedural mechanism is available. Thus, this Court has and should exercise its power to scrutinize the images before trial.

---

[66] *United States v. Ragsdale*, 426 F.3d 765, 779 (5th Cir. 2005) (internal citations and quotations omitted).

[67] *Id.* at 779–80 (emphasis added) (quoting *Roth v. United States*, 354 U.S. 476, 497 (1957) (Harlan, J., concurring in part and dissenting in part)).

[68] R.52:26 (quoting *Ft. Wayne Books v. Indiana*, 489 U.S. 46, 79 (1988) (O'Connor, J., dissenting)).

[69] R.64:29 n.12.

### ii.    As a matter of law, images of boys' penises (without more) are not patently offensive, hard-core pornography.

Establishing that these counts *can* be dismissed, the question becomes whether the charged images are obscene. The government does not spend much time arguing that these images sail past *Miller*. It simply posits that they depict children with exposed genitalia and that's patently offensive—or at least it thinks so and it hopes a jury will too.[70] That logic runs headlong into the fact that "[u]nder any test of obscenity as to minors not all nudity [is] proscribed. Rather, to be obscene 'such expression must be, in some *significant* way, erotic.'"[71] And it's not just that the image is pornographic—that doesn't cut it. "[A] pornographic but not obscene representation [that] did not depict real children would place that representation on the protected side of the line."[72] To get over the protected line, the image must depict hard core, patently offensive pornography. And whatever might be said about these images, they're not that. As it was in *Arthur*, the images are rather ordinary.[73]

That leads to the other point worth stressing about the government's cases: just because there are cases where a man masturbating was deemed obscene, doesn't mean the same image will be deemed obscene years later. That reality, reflected in *Arthur,* stems from *Miller*'s discussion of the sexual revolution: "One can concede that the 'sexual revolution' of recent years may have had useful byproducts in striking layers of prudery

---

[70] *See id.* at 28–30.
[71] *Erznoznik v. Jacksonville*, 422 U.S. 205, 213 n.10 (1975) (emphasis added) (quoting *Cohen v. Cal.*, 403 U.S. 15, 20 (1971)) .
[72] *Williams*, 553 U.S. at 309 (Stevens, J., concurring).
[73] *See United States v. Arthur*, 51 F.4th 560, 570–71 (5th Cir. 2022).

from a subject long irrationally kept from needed ventilation."[74] Standards change. And society (absent a great religious awakening) does not become more prudish. So there may be cases where (decades ago) a court thought that an image was obscene; but now it's 2025, and that same image is pedestrian. It's still pornographic, but it's not hard core, patently offensive pornography. The former is protected, the latter is not. And the line between the two does not mean that everything short of a woman in a bathing suit would be an open question.

Consistent with the Court's independent constitutional duty to review the images, the images should speak for themselves. When the Court sees the three images at issue in Counts Two and Three, it can see what the defense has maintained: the images may be weird, even disturbing, but they are not hard core, patently offensive pornography. And as such, they cannot be upheld as a basis to force Anderegg to trial for a jury to find the same.

### C.    The search warrant was not supported by probable cause and the evidence seized under it should be suppressed.

A search warrant may only issue when there is probable cause to believe that evidence of a crime exists within the particular place to be searched. "When an affidavit is the only evidence presented to the judge in support of the warrant, then the validity of the warrant rests solely on the strength of the affidavit."[75] In that regard, the affidavit must provide the "judge with a substantial basis for determining that probable cause

---

[74] *Miller*, 413 U.S. at 36.
[75] *United States v. Peck*, 317 F.3d 754, 755 (7th Cir. 2003).

Hurley Burish, S.C.

exists."[76] And in reviewing the affidavit for probable cause, courts are limited to its four corners—here, the details alleged in the Instagram and Residence search warrant affidavits.

The government makes five principal arguments in favor of upholding the warrants. First, the descriptions are consistent with what the Supreme Court approved of in *P.J. Video*. Second, Anderegg's chat conversations make it reasonable to believe that he would possess obscene materials. Third, the IP address doesn't matter—the usernames were similar and that's enough. Fourth, the descriptions of prepubescent minors were accurate. And fifth, the good faith doctrine saves the fruits of the searches.

### i.    *P.J. Video* illustrates that these descriptions were not enough for the Magistrate Judge to make a searching inquiry.

The search warrant descriptions were insufficient to find probable cause that the images were legally obscene. In response, the government argues that other courts have upheld more cursory affidavit descriptions, but the quote it uses to support that point is sanitized.[77] Twice, the government notes that *P.J. Video* provides the standard and it's just the same as any other warrant and the Court approved "affidavits briefly describing hours-long videos as showing 'fondling and cunnilingus,' 'intercourse,' and 'fellatio[.]'"[78] And thus, what was provided in these affidavits more than suffices.

To the first point, *P.J. Video* is clear that it wasn't overruling (but rather relying on) *Marcus* and the proposition that First Amendment concerns demand a searching

---

[76] *Illinois v. Gates*, 462 U.S. 213, 239 (1983).
[77] R.64:30, 38.
[78] *Id.* at 38.

Hurley Burish, S.C.

inquiry.[79] And the defense never argued that probable cause wasn't the standard, just that *Marcus* articulates probable cause in an obscenity context, and it's not the same inquiry as other warrants for contraband. "It is no answer to say that obscene books are contraband, and that consequently the standards governing searches and seizures of allegedly obscene books should not differ from those applied with respect to narcotics, gambling paraphernalia and other contraband."[80] In *P.J. Video,* the Supreme Court echoed that point: "In our view, the longstanding special protections described above, and enunciated in cases such as *Roaden*, *A Quantity of Books*, *Marcus*, *Heller*, and *Lee Art Theatre*, are adequate to ensure that First Amendment interests will not be impaired by the issuance and execution of warrants authorizing the seizure of books or films."[81] And those protections are: "the Magistrate Judge [must] have focused *searchingly* on the question of obscenity."[82] Thus, there is no basis to think (in the least) that *P.J. Video* provides a different standard than what the defense set out in the opening brief.

That leads to the second problem with the government's framing of *P.J. Video*: the case didn't (as the government represents) bless a conclusory description of sexual acts.[83] Not in the least.  In *P.J. Video,* the Court put the affidavits into the appendix. And this is the description that it found provided probable cause, a description that allowed the Magistrate Judge to make a searching inquiry into whether the videos are obscene. It's

---

[79] *P. J. Video, Inc.*, 475 U.S. at 875.
[80] *Marcus v. Search Warrant of Property*, 367 U.S. 717, 730–31 (1961); *Ft. Wayne Books*, 489 U.S. 46, 63–64 (1989).
[81] *P. J. Video, Inc.*, 475 U.S. at 875.
[82] *Id.* n.6 (internal quotation and alteration omitted).
[83] R.64:38.

HURLEY BURISH, S.C.

easy to skip over a block quote as long as this one, but it's important to read it and see

how fundamentally it differs from what was provided here.

> On September 23rd, 1983, I viewed the video tape movie "TABOO II," which was rented on September 20th, 1983, from Network Video, 5868 Transit Road, Depew, New York.
>
> The content and character of the above-mentioned video movie: The theme of the movie is a middle-class neighborhood where a home is the place where all the sexual acts are performed. The movie starts with a brother and sister, a white male and white female, fondling each other. The second scene is another house scene where a white male and white female are giving a rubdown to a white female. The sexual acts that follow include cunnilingus and fellatio. *There is also intercourse and the scene closes with the male placing his penis between the girl's breasts and ejaculating into and over her mouth. In another scene there is some incestuous type activity between the brother and the sister where again fellatio and intercourse are performed. At one point during the movie the mother enters the bedroom and observes the two performing the sexual acts and becomes depressed about the situation.* In a later scene the son and his mother are on a couch where *they become involved in sexual acts of intercourse and fellatio.* The movie closes with the mother and father asleep in their bedroom at which time the daughter enters and sleeps next to her father, where *they perform incestuous acts of intercourse, and she performs fellatio on her father.*[84]

Juxtapose that detailed description of sexual and incestual conduct with what the

government provided here.

> This image depicted what appeared to be a different prepubescent juvenile male kneeling on a blue blanket in a wooded area *leaning back on his hands with his legs spread far apart exposing his erect penis.* The male had a blue cloth draped across his stomach, but other than that, was completely nude. There was a partially clothed juvenile female with brown hair kneeling to the left of the male looking over his shoulder at him. The male in this image was posed in a manner that made his *penis* the focal point of the image. This image appears to be computer-generated content.[85]

---

[84] *P.J. Video, Inc.*, 475 U.S. at 878–79.
[85] R.52-1:19 (emphasis added).

Hurley Burish, S.C.

It's a difference in quantity and in kind.

To take the issue one step further, and to address the government's position on the images the defense "conjured up," the descriptions that the Magistrate Judge reviewed did not permit the searching inquiry that the law demands. The vague, amorphous descriptions the search warrant provided belied the Judge's ability to decide whether the image was obscene. In contrast, the affidavits in *P.J. Video* described "numerous acts of *deviant* sexual intercourse," and provided enough detail that, when considering the title, theme, plot, and setting, "serious value, if any, may reasonably be discerned. The films were described in each of the five *nonconclusory* affidavits in such a fashion as to permit the magistrate to focus *searchingly* on the issue of obscenity."[86] The point is: it doesn't matter whether the images in the defense's opening brief were about exposed genitalia or digital penetration, it's that the descriptions didn't meet the law's demands. It's clear that this warrant's descriptions needed more detail to establish probable cause than the passing mention of genitalia they offered.

### ii.    Anderegg's chats don't make it reasonable to believe that he had obscene images.

The government goes on for pages about the facts in the warrant, with bullet points and no citations to argue that Anderegg's other behavior (showing a sexual interest in children) was enough to get a warrant.[87] It argues:

---

[86] *P.J. Video, Inc.*, 475 U.S. at 877 (emphasis added) (quoting *New York v. P.J. Video, Inc.*, 65 N.Y.2d 566, 580, 483 N.E.2d 1120, 1130 (Jasen, J., dissenting)).
[87] R.64:35–36.

> The warrant allowed him to reasonably conclude that: the defendant used this Instagram account to post images of semi-nude minors in sexualized bondage attire; he posted more explicit images that had been "flagged" and gotten him "banned" from Telegram; he followed another user who wanted to talk about "young boy addiction" on Telegram; he created and sent at least two images of prepubescent minors exposing their erect penises in front of other children to a 15-year-old who wanted images of "[p]re teen" boys; and he engaged in similar child-pornography-related conduct just a few years prior.[88]

None of those things are crimes. It's not illegal to have the fantasies and the sexual interests expressed there. Not in the least. So too, communicating with a 15-year-old is not illegal—true, it's not a good idea, but it's not illegal. The only crime is whether the images shared qualify as obscene.

That's why the descriptions matter so much, because if the images described are not obscene, there is no basis for a search warrant to issue. The distinction between suspicion that a person has a deviant sexual interest and probable cause to search their home for evidence of a crime has been drawn repeatedly by courts in child pornography cases. In those instances, courts have been clear that evidence of sexual interest or even sexual contact with a minor does not provide probable cause to search for evidence of illegal images. Four Circuit Courts have held as much.

---

[88] *Id.* at 37.

Hurley Burish, S.C.

- **Second Circuit**: "It is an inferential fallacy of ancient standing to conclude that, because members of group A (those who collect child pornography) are likely to be members of group B (those attracted to children), then group B is entirely, or even largely composed of, members of group A."[89]

- **Sixth Circuit**: "[I]t is beyond dispute that the warrant was defective for lack of probable cause—[the warrant's author] established probable cause for one crime (child molestation) but designed and requested a search for evidence of an entirely different crime (child pornography)."[90]

- **Third Circuit**: "To be sure, the affidavit provides reason to believe that [the defendant] had committed sex crimes against his students on school property, … . But those allegations are not sufficient to establish—or even to hint at—probable cause as to the wholly separate crime of possessing child pornography."[91]

- **Ninth Circuit**: "The affidavit contains no facts tying the acts of [the defendant] as a possible child molester to his possession of child pornography. The affidavit provides no evidence of receipt of child pornography."[92]

Again, evidence that a person has a certain predilection does not mean there is probable cause that they possess illegal images—whether it be child pornography or obscene images of virtual children. If the described images are *not* obscene, then the chats alone cannot provide probable cause to search Anderegg's accounts or home. That's why the government's pages and pages of atmospherics into the deviance don't matter. The only thing that matters is whether the judge was provided a sufficient basis to make a searching inquiry into whether the images were obscene.

---

[89] *United States v. Falso*, 544 F.3d 110, 123 (2d Cir. 2008).

[90] *United States v. Hodson*, 543 F.3d 286, 292 (6th Cir. 2008).

[91] *Virgin Islands v. John*, 654 F.3d 412, 419 (3d Cir. 2011).

[92] *Dougherty v. City of Covina*, 654 F.3d 892, 898 (9th Cir. 2011).

HURLEY BURISH, S.C.

### iii.    For the Residual warrant to issue, the government needed to tie the IP address sharing the images to Anderegg's house.

In its effort to uphold the warrant, the government also argues that it doesn't matter that the investigators didn't subpoena the IP address information for the correct day. The government doesn't explicitly concede the point, but doesn't address it either — just passing on and arguing "the IP address was not the only evidence tying this conduct to the defendant's home."[93] It bolsters that point with a logic chain that conflates three different things:

1. A prior investigation that didn't result in any charges.
2. A November 2022 tip that didn't result in any charges or evidence of child pornography.
3. The 2023 contact with a fifteen-year-old using an account with a linked device and a similar name as the 2022 tip.

But in search warrants (as in life) zero plus zero plus zero doesn't get you to probable cause for a particular place to be searched.

The government may have had evidence to investigate Anderegg's accounts, but it didn't have probable cause tying *any* criminal activity to his home. The prior investigation (point 1) provided none. The 2022 Tip was not of actual child pornography — no reason to search under point 2. And the contact with the fifteen-year-old was not connected to Anderegg's home. There was, in other words, not  evidence tying the image to the home. Without the IP address connection, the warrant failed to establish a nexus between the criminal activity and the place to be searched.[94]

---

[93] R.64:42.
[94] R.52:38–40.

### iv. The Court should hold a *Franks* hearing and establish that the images are not of prepubescent minors since they have pubic hair and muscular development.

In response to the request for a *Franks* hearing, the government makes several arguments. First, it suggests that the defense's characterization of the images is not accurate. It is. Look at the images and the Court can see. Second, it argues:

> But even granting as true his claim that the minors in these images have other features that are incompatible with prepubescence, it is undisputed that the defendant was asked to create images of "[p]re teen" boys and then delivered images that depict minors with extremely slender physiques and "very young" faces that appear prepubescent. Given the circumstances, it is both accurate and reasonable to characterize the minors in these images as prepubescent.[95]

The point is misplaced. It's not reasonable to characterize the images as prepubescent. True, the images can't be put on a Tanner Scale, but the Magistrate Judge needed to be informed (in its searching inquiry) that these images were not as one usually imagines when a warrant references prepubescent minors—*e.g.*, someone who has yet to hit puberty. Here, the boys portrayed have leg and pubic hair and muscles that only come with puberty. So it's simply not accurate or reasonable to characterize the figures in the images as prepubescent. And the affiant was reckless not to include such details.[96]

That problem underlies the rest of the government's analysis—particularly whether the misrepresentation was material. Consistent with *Free Speech Coalition,* age and by the same token being pre- or post-pubescent matters. An image of a post-pubescent teenager with an erect penis just isn't obscene. There are museums and coffee

---

[95] R.64:45.
[96] R.50:6–7.

HURLEY BURISH, S.C.

table books full of them. Again, if it's an image of a real child, the image could be child pornography under *Ferber*, but it wouldn't be condemned as hard core patently offensive pornography under *Miller*. The two are not mutually exclusive. And if that's the case (and it is), then it's impossible to dismiss as immaterial facts that speak to this being protected speech—namely, those captured in the images are post-pubescent. It matters. The Magistrate Judge should've been given the information he needed to make the searching inquiry, and that information had to include that the images were of post-pubescent males.

> **v.    The good faith doctrine doesn't save the warrant because *Franks* applies and no reasonable officer could believe the description was sufficient.**

When it comes to invoking the good faith doctrine, the government spends a single paragraph on why it should apply. It notes:

> Here, the defendant cannot rebut the presumption of good faith. As explained above, the agent who described the challenged images endeavored to do so accurately—certainly not recklessly—by providing a neutral, non-conclusory description of what they depict, along with all the relevant context known at the time. As a result, the warrants contained lengthy factual recitations in support of probable cause, both of which point to the defendant having used an anonymous Instagram account to create and send images of prepubescent minors exposing their erect penises to young children to a 15-year-old.[97]

There are two problems with the government's assessment of good faith.

First, the good-faith doctrine does not apply to *Franks* violations. If the Court finds that *Franks* applies and that the omitted details are material, then good faith does not

---

[97] R.64:48.

apply. "A warrant that violates *Franks* is not subject to the good-faith exception to the exclusionary rule."[98]

Second, the question is whether the government can claim good faith on the images' descriptions specifically, not the affidavits' general allegations of "relevant context." Were these descriptions enough for a "searching inquiry" on the obscenity issue? In that regard, no reasonable officer could believe that what was provided rose to probable cause that the images were obscene. You can't read what was approved in *P.J. Video* and what is demanded in *Marcus* and the other cases discussed above and believe that the single paragraph of an AI generated hodge-podge of body parts with an erect penis is obscene. And thus, *Leon* cannot apply here.

**D.    The Court can (and should) review *in camera* the grand jury instructions.**

Given everything laid out above, it seems difficult to fathom that a *properly* instructed grand jury would find the three images at issue in Counts Two and Three obscene. Pornographic? Sure. But obscene is *really* a stretch. As noted above, the government's response to the pretrial motions highlights the need for the Court to assess the grand jury instructions. The government (the defense respectfully submits) is laboring under an incorrect understanding of the law—conflating pornographic materials with virtual children as equivalent to child pornography. The bulk of its brief makes that clear. If the government's take on the law is off, then it's very likely that the grand jury had the same misconception when it returned the indictment.

---

[98] *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990); *accord United States v. Glover*, 755 F.3d 811, 814 (7th Cir. 2014).

HURLEY BURISH, S.C.

The government is, after all, the body that supplies the grand jury with its direction on the law. As one court put it: "As a legal advisory to the grand jury, the prosecutor must give the grand jury sufficient information concerning the relevant law to enable it intelligently to decide whether a crime has been committed."[99] And the only way to know what the grand jury thought it needed to find in order to indict Anderegg is to examine the instructions. It's that simple. The defense doesn't even have to see it; the request is only that the review be *in camera*. If the grand jury was properly instructed and the case survives the other motions, we'll prepare for trial.

The government forcefully protests on the propriety of this Court reviewing the instructions *in camera*. But the case law is not as bold and one-sided as the government claims it to be. The government cites the Supreme Court in *Kaley v. United States*, and from there concludes that the defense is not entitled to the instructions.[100]  But *Kaley* is about actually re-litigating the probable cause determination, not the grand jury's legal instructions: "[The Kaleys'] argument is instead about who should have the last word as to probable cause."[101]  The defense is not interested in challenging whether there are sufficient facts to indict Anderegg. It only cares whether the grand jury got the law right.

If the grand jury isn't properly instructed, then the Presentment Clause has been violated. After all, "[the grand jury's] responsibilities continue to include both the determination whether there is probable cause to believe a crime has been committed and

---

[99] *See United States v. Twerskey*, 1994 WL 319367, *4 (S.D.N.Y. 1994) (internal quotations omitted).
[100] R.64:32 (quoting *Kaley v. United States*, 571 U.S. 320, 328 (2014)).
[101] 571 U.S. at 327.

HURLEY BURISH, S.C.

the protection of citizens against unfounded criminal prosecutions."[102] If the Court does not demand that the grand jury be properly instructed, then getting an indictment is a mere formality. Yet that is the exact opposite of what the courts have said: "Where a prosecutor's legal instruction to the grand jury seriously misstates the applicable law, the indictment is subject to dismissal if the misstatement casts 'grave doubt that the decision to indict was free from the substantive influence of the erroneous instruction.'"[103]

The law demands a properly instructed grand jury.[104] One that understands exactly the elements of the statute controlling Anderegg's alleged behavior. To the extent that the government is positing theories to the grand jury that don't align with the way this crime is defined, then the grand jury has been mis-instructed. And the remedy would be dismissal.[105] Again, the issue is not whether the defense agrees with the charging decision (we clearly don't), but whether the grand jury was properly instructed. The only way to determine that is by reviewing the grand jury instructions. Without them, Anderegg will face a minimum of five years imprisonment without a grand jury having found probable cause to believe the images were actually obscene under *Miller*. And that contravenes *Jenkins* and the Supreme Court's promise (for a third time) that: "no one will

---

[102] *See United States v. Calandra*, 414 U.S. 338, 343 (1974)

[103] *United States v. Stevens*, 771 F. Supp. 2d 556, 566 (D. Md. 2011) (quoting *United States v. Peralta*, 763 F. Supp. 14, 21 (S.D.N.Y. 1991));

[104] *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988).

[105] *See, e.g., Stevens*, 771 F. Supp. 2d at 566–68 (dismissing indictment for erroneous instruction to grand jury regarding advice of counsel defense); *Peralta*, 763 F. Supp. at 21 (dismissing indictment for possibly erroneous and misleading legal instructions, among other issues).

HURLEY BURISH, S.C.

be subject to prosecution for the sale or exposure of obscene materials unless these materials depict or describe patently offensive hard core sexual conduct."[106]

### E. In order to prepare for trial, the Court must allow the defense to have the images.

The defense has set out precisely why § 3509 does not apply to these images. They are not child pornography, nor are they virtually indistinguishable from child pornography. The limitations upon defense counsel's access set out in § 3509 are not applicable. And the images are not contraband—in any form. To make its point the government *again* rests its position on the fact that these images are child pornography. It argues:

> Indeed, and as this Court has recognized, even before the enactment of § 3509(m), courts had determined that it was reasonable for the government to refuse a defendant's request to copy child pornography on the ground that the materials are illegal contraband. *United States v. Kimbrough*, 69 F.3d 723, 731 (5th Cir. 1995) ("Child pornography is illegal contraband. We decline to find that Rule 16 provides such contraband can be distributed to, or copied by, the defense." (internal citation omitted)).[107]

That argument harkens back to the first lines of the opening brief and this brief: the rules of child pornography do not apply here.

As a final point, it's not enough to note that the defense can see the images. We can. It is very difficult to arrange—not because of the agent (he's been great)—but given the limited number of evidence rooms (there's two) and busy schedules. The defense needs to use these images to prepare for trial and to inform our expert since he can't

---

[106] 418 U.S. at 160 (cleaned up).
[107] R.64:51.

finalize his report until he sees the images. The defense is fine with a protective order or anything else that will allow it to meaningfully prepare for trial. The Sixth Amendment demands as much and § 3509 does not preclude it.

## IV.    Conclusion.

In the end, this case presents lots of interesting legal issues, no question. But it's not as complicated as the government would have it. Apply *Miller,* apply *Stanley,* apply *Jenkins,* apply *Free Speech Coalition,* and the case is over. That's all the defense asks. Simply apply the protections that Anderegg and all citizens are promised under the First Amendment. Those protections are absolute and not eroded by questions of policy. Instead, those protections mean the defense's motions must be granted.

Dated this <u>17th</u> day of January, 2025.

Respectfully submitted,

STEVEN ANDEREGG, *Defendant*

<u>*/s/ Joseph A. Bugni*</u>
Joseph A. Bugni
*Wisconsin Bar No.* 1062514
Oliva P. Heiser (law clerk)
HURLEY BURISH, S.C.
33 E. Main Street, Suite 400
Madison, WI 53703
(608) 257-0945
jbugni@hurleyburish.com

HURLEY BURISH, S.C.